471 P.2d 42

Joseph G. HANSEN, on behalf of himself and all other taxpayers of the County of Kootenai, State of Idaho, Plaintiffs-Respondents,

v.

KOOTENAI COUNTY BOARD OF COUNTY COMMISSIONERS, acting by and through Henry J. Meyer, Ralph W. Cope, and Don Adams, and the Coeur d'Alene Turf Club, Inc., an Idaho corporation, and Donald MacDonald, Lloyd Shelhamer, Jr., Ruland J. Gill and Kenneth Wiegele, its officers, Defendants-Appellants.

No. 10458.

Supreme Court of Idaho.

June 23, 1970.

Rehearing Denied July 16, 1970.

Gary M. Haman, Pros. Atty., Kootenai County, Coeur d'Alene, for appellant Kootenai County Board of County Commissioners.

E. L. Miller and James W. Ingalls, Coeur d'Alene, for appellants Coeur d'Alene Turf Club, Inc., and its officers.

J. Ray Cox and Frank Powell, Coeur d'Alene, for respondents.

McFADDEN, Chief Justice.

This appeal is from the judgment of the district court determining that a lease of July 18, 1968 is void. The lease involved was executed by the appellant board of county commissioners of Kootenai County and by appellant Coeur d'Alene Turf Club, Inc. Prior to the execution of this lease, another lease had been executed by the same parties, and in previous proceedings in this action the district court held the first lease to be null and void. This court has also previously considered a subsidiary issue in this litigation. See Coeur d'Alene Turf Club, Inc. v. Cogswell, 93 Idaho 324, 461 P.2d 107 (1969).

Kootenai County for a number of years prior to this litigation has owned certain real property north of Coeur d'Alene adjacent to and east of Highway No. 95. This property generally is referred to as to Kootenai County Fairgrounds. In 1964 subsequent to enactment of the Idaho Horse Racing Act, Ch. 25 of Title 54, I.C., the county commissioners, in order to provide for horse racing, arranged for construction of a race track and certain barns on this property. The county also extended the north end of a grandstand already on the

site and did other work, expending about $32,000 from the county fair building fund for these improvements.

In June 1966 the county then leased the race track, the barns and the grandstand to the North Idaho Racing Association for the purpose of conducting pari-mutuel horseracing on certain specified days. The relationship between this group and the county was apparently unsatisfactory and the parties terminated the agreement with the association still owing about $1,200 to the county.

In 1967 the appellant Coeur d'Alene Turf Club (hereinafter referred to as either the appellant or the Turf Club) was incorporated, and on March 29, 1967 it entered into a written five year lease with Kootenai County, leasing that portion of the fairgrounds property which included the racetrack, grandstand, certain barns, parking area, and related grounds necessary for ingress and egress. The Turf Club agreed to pay the $1,200 which was still owing the county from the prior lease and also agreed to pay as rent one per cent of the gross amount handled on all wagering up to a maximum rental of $20,000 per year. The lease also provided that the county would give the Turf Club credit against its rental payments for any permanent improvements made to the property by the Turf Club up to a maximum of $100,000.

During 1967, the county expended money from the fair building fund[1] for payment of insurance premiums for insurance coverage on all buildings on the fairgrounds property, including the buildings leased to the Turf Club, and extended a water line into the barn area leased to the Turf Club. Other than these expenditures, all money spent on the county fairgrounds was spent on areas not leased to the Turf Club.

During 1967 the Turf Club made extensive improvements to the premises leased to them. The record shows that the Turf Club expended about $137,000 on the improvements. The county had an appraisement made of the improvements, and the appraisement indicated the value of these improvements to be $109,782, which was the valuation placed on the improvements by the district court in its findings of fact. During 1967 the Turf Club also paid for various operating expenses of the racetrack, including lights and water, and also carried liability insurance on the operation and property.

In making the improvements under the terms of the lease from the county, the Turf Club had an agreement with a local contractor, but it was not put out for public bid. The record is devoid of any evidence that the work was done by a licensed public works contractor. The trial court found that the entire construction was contracted and paid for by the Turf Club.

1. The County Fair Building Fund is a fund into which tax moneys levied on assessed property in the county under provisions of I.C. § 31–822 is deposited and disbursed. This fund is separate from the fund that handles tax levies made pursuant to I.C. § 22–206, which levies are based on the budget submitted by the county fair board. The county fair board is a separate entity from the board of county commissioners. I.C. § 22–201 et seq. I.C. § 22–204 provides:

"It [county fair board] shall take charge of and manage all such property as the county may have acquired or set aside for fair purposes pursuant to the provisions of section 31–822."

In the instant case no resolution was submitted to the court as to what prop-

erty the board of county commissioners had "set aside for fair purposes pursuant to the provisions of section 31–822," but Exhibit 1 shows that out of all of the property owned by the county generally known as Kootenai County Fairgrounds, the southwest portion of it (a tract about 940 feet north and south by about 635 feet east and west) was the property primarily used for the purpose of conducting fairs. Numerous witnesses testified to the fact that this property, which was outlined in red on Exhibit 1 (a map of the county fairgrounds) was the property used for fair purposes. This property was excluded from the terms of the lease by the county to appellant Turf Club (Exhibit 10).

On August 7, 1967, respondent Joseph G. Hansen, a citizen of Idaho and a taxpayer of Kootenai County, in his own behalf and on behalf of all other taxpayers of Kootenai County, instituted an action in the district court challenging the legality of the 1967 lease between Kootenai County and the Turf Club. Following motions by each party for summary judgment, the district court in July 1968 granted summary judgment to respondent Hansen, ruling that the lease was in violation of Idaho Const. Art. 8 § 4 and Art. 12 § 4, and was thus null and void. No appeal was taken from this judgment.

On July 17, 1968, following the district court's ruling, the board of county commissioners adopted the following resolution:

"BE IT HEREBY RESOLVED by the Board of Commissioners of Kootenai County, Idaho, in regular session, that the property known as the Kootenai County fair grounds, located on U. S. Highway #95, consisting of approximately 100 acres, more or less, and situate in Section 36, Township 51 North, Range 4 W.B.M., Kootenai County, Idaho, be, and the said property is hereby declared not necessary for public use or needed by the public excepting for, and exclusive of, one (1) month each calendar year, to-wit: September 1st through September 30th, during which the Kootenai County fair is prepared for, conducted for approximately three (3) days, and disbanded, and during which all activities in conjunction with, and necessary to the operation and success of, the Kootenai County fair shall be conducted by the County of Kootenai through its duly elected, qualified and acting Board of Commissioners, with the cooperation and assistance of the Kootenai County Fair Board."

The next day the county and Turf Club entered into a new lease agreement covering the same property.[2] The term of the lease was from July 11, 1968 through August 30, 1971. It provided that the lessee (Turf Club) should have possesson of the property for the purpose of conducting racing and pari-mutuel operations. The county reserved the right to permit a veterans organization to conduct all parking facilities. It provided that the lessee was to have possession of the barns from May 1 through August 30 of each year. The county also reserved the right to allow other groups to use the premises so long as the use did not interfere with the lessee's use. The lessee agreed to maintain the property and make repairs, and the lease also specified that no modification or change in the facility could be made without written approval by the county engineer; that all additions and improvements which become part of the real property revert to the county on termination of the lease; and that if the county sustained additional expense of insurance, the lessee was to pay such additional expense. The lease also provided

"Nothing herein shall be interpreted or construed to place any financial burden or liability on the Lessor due to use thereof by the Lessee."

Insofar as consideration for the lease is concerned, it provided:

"WHEREAS, the Lessee has, prior to the date hereof, made valuable improvements to the said property in an agreed value of $109,782.00, which improvements have been approved by the County Engineer and has paid and discharged the obligation of the North Idaho Racing Association to the Lessor in the amount of $1,200.00, and said sum has been ac-

2. "The SW ¼ of Section 36, Twp. 51 North Range 4, W.B.M., LESS the East 800 feet thereof; Less the South 60 feet thereof (road right-of-way), and LESS the further portion of said property described as follows:
Beginning at the SW corner of SW ¼ of Section 36, Twp. 51 North, Range 4, W.B.M.; thence North 940 feet; thence East 635 feet to the fence; thence South along said fence 337 feet; thence East 27 feet; thence South 608 feet; thence West 662 feet to the point of beginning."

cepted as payment in advance of all rental due or to become due under this lease and that said improvements do and have substantially improved the said property and directly benefitted [sic] the Lessor, * * *."

During 1968 the county did not expend public money to maintain or improve the leased property, other than to pay the premiums on fire insurance on the building and to do certain grading and other road work on access roads to the entire property.

By a supplemental complaint filed in the same action, the respondent again challenged the legality of the second lease. An answer was filed and a trial of the issues was held before the court. In its memorandum decision (treated as findings of fact and conclusions of law under I.R.C.P. 52(a)) and judgment, the trial court held the second lease unconstitutional as a violation of Idaho Const. Art. 8 § 4 and Art. 12 § 4. The Turf Club and Kootenai County each separately appealed from the judgment holding the lease to be null and void.

Before discussing the principal issue of this appeal, i.e. whether this lease is violative of the constitutional provisions, a preliminary issue concerning the statutory authority of the board of county commissioners to enter such a lease should be disposed of.

Appellants contend that I.C. § 31–836, which provides in part,

"Except as otherwise provided by law, the board of county commissioners may lease any property belonging to the county for a term not exceeding five (5) years at such rental as may be determined upon by the unanimous vote of such board * * *."

is a grant of legislative authority to the board to execute a lease such as is before this court. On the other hand the respondent urges that I.C. § 31–822, which provides in part,

"To contract to purchase a site, grounds or parks on which to hold public

fairs or exhibitions, to care for and maintain the same, regulate the use thereof and, in their discretion, to *let, demise or lease the same to the State of Idaho or the department of agriculture for such public fair or exhibition purposes upon such terms and conditions and for such consideration as in their judgment shall best promote the holding of such public fairs or exhibitions."* (Emphasis added.)

prohibits the lease of the fairgrounds property to anybody, individual or corporate, other than "to the state of Idaho or the department of agriculture". Respondent argues that these two statutory provisions concern the same subject and hence the specific (I.C. § 31–822) is controlling over the general (I.C. § 31–836). State v. Roderick, 85 Idaho 80, 375 P.2d 1005 (1962). It is our conclusion, however, that these two statutory provisions do not deal with the same subject. The first quoted provision deals with the authority of the board of county commissioners to lease county property regardless of the purpose of the lease or use to be made of the county property. The latter quoted provision deals with the authority of the board of county commissioners to lease "a site, grounds or parks on which to hold public fairs or exhibitions" to the state of Idaho or the department of agriculture *"for such public fair or exhibition purposes."* (Emphasis added.)

Both of these statutory provisions are referred to in I.C. § 31–801 which provides:

"The boards of county commissioners in their respective counties shall have jurisdiction and power, under such limitations and restrictions as are prescribed by law, as provided in the following sections, numbered 31–802 to 31–836, inclusive."

It is our conclusion that these two statutory provisions relied on by the respective parties complement each other, I.C. § 31–836 generally authorizing the boards of county commissioners to lease county property, and I.C. § 31–822 authorizing the

660

board of county commissioners to lease the fairground property for public fairs or exhibitions "as in their judgment shall best promote the holding of such public fairs or exhibitions." If the authority of the county commissioners to lease this type of property were limited to leasing it solely to the state or department of agriculture, it would mean that property of this nature would lie dormant for many months of the year. It is difficult to believe that the legislature intended that result. It is the court's determination that I.C. § 31–822 does not prohibit the board of county commissioners from entering into this lease.

The central issue in the present case is whether the lease violated Art. 8 § 4 and Art. 12 § 4 of the Idaho Constitution. Article 8 § 4 provides that

"No county, city, town, township, board of education, or school district, or other subdivision, shall lend, or pledge the credit or faith thereof directly or indirectly, in any manner, to, or in aid of any individual, association or corporation, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state."

and Art. 12 § 4 provides that

"No county, town, city, or other municipal corporation, by vote of its citizens or otherwise, shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for, or make donation or loan its credit to, or in aid of, any such company or association * * *."

The respondent, and the district court in its opinion holding the lease unconstitutional, rely heavily upon this court's decision in Village of Moyie Springs, Idaho v. Aurora Manufacturing Co., 82 Idaho 337, 353 P.2d 767 (1960). That case involved an Idaho statute which authorized cities to issue revenue bonds to finance the acquisition of land and construction of buildings which were to be leased or sold to private enterprise. The avowed purpose of the

statute was to increase employment and stabilize the economy. Under the factual situation in that case, the Village of Moyie Springs, pursuant to the statute, enacted an ordinance providing for issuance of revenue bonds for the acquisition of a site and construction of an industrial plant and authority to enter into a lease of the premises with the defendant Aurora Manufacturing Company. When Aurora questioned the constitutionality of the arrangement and refused to complete the arrangement, the village instituted an action for a declaratory judgment adjudicating the constitutionality of the statute and ordinance. This court held that the statute and ordinance were unconstitutional as violations of Art. 8 § 4 and Art. 12 § 4 of the Idaho Constitution, stating

"It is obvious that one of the prime purposes of having the necessary bonds issued by and in the name of a municipality is to make them more readily salable on the market. Thus, the credit of the municipality is extended in aid of the project, regardless of the limitations placed upon the remedy of the purchaser. * * * 'It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess. * * * The loan of its name by a city to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit.'" 82 Idaho at 345–346, 353 P.2d at 772–773.

This court also pointed out that the expenditures were primarily for the benefit of a private concern and that any benefit accruing to the public was merely incidental.

It is our opinion that Village of Moyie Springs, Idaho v. Aurora Manufacturing Co., supra, is distinguishable from the case at bar. The distinction lies in the fact that in that case the city financed with its own funds the acquisition of land which was admittedly not to be used by the village for public purposes, but rather was at the out-

set intended to be leased to private business. In the present case, on the other hand, the fairgrounds are utilized by the county for the public purpose of conducting the county fair and a portion thereof is leased to a private concern only when not needed for public purposes. It is readily apparent that the Village of Moyie Springs had no use for the land and industrial site it acquired other than to lease it to the Aurora Manufacturing Company, whereas in the present case Kootenai County does have a public use for the fairgrounds and leases them only when not needed for the public purposes.

■ This distinction has been recognized in cases from other jurisdictions. In Annot. 161 A.L.R. 518 at p. 520 it is stated that

"* * * generally, a provision of the Constitution prohibiting municipalities from lending their credit in aid of private enterprises is not violated by a sale or lease by the municipality of its property [citing cases]."

The same annotation in dealing with the circumstances which will bring such a lease within the prohibition of the constitutional provision states at p. 530

"It has been held that a municipality does not have, ordinarily, the power to construct an improvement with the avowed and declared purpose of selling the same to private persons."

It is our opinion that Village of Moyie Springs, Idaho v. Aurora Manufacturing Co., supra, falls into this latter category whereas the present case falls under the general rule that a municipality may lease its property to a private concern when the lease does not conflict with the public's use or need for the property. See 10 McQuillin, Municipal Corporations, § 28.42, p. 124 (3d ed.).

■ It is our conclusion that the present case is controlled by the reasoning set out in Hansen v. Independent School Dist. No. 1, 61 Idaho 109, 98 P.2d 959 (1939). In that case citizens and civic groups raised funds to equip a field owned by the school district for night baseball. The school district paid for half of the wages of a special caretaker for the field and paid for miscellaneous upkeep and water for the premises. The school district then leased the field to a professional baseball organization in consideration of a share of the gate receipts. The validity of this lease was challenged under the same constitutional provisions raised here. This court, however, rejected the argument and upheld the lease stating that

"It is the almost universal rule that the leasing of school buildings and parks for private purposes which are not inconsistent with the conduct of the school, is not an unconstitutional use of such property." 61 Idaho at 114, 98 P.2d at 961.

We see no reason to distinguish between the lease to a private corporation of a baseball field owned by a public entity and the lease of county fairgrounds to a private concern. In either case, so long as the lease does not conflict with the public's use of the property, there is no constitutional violation. See also Clarey v. City of Philadelphia, 311 Pa. 11, 166 A. 237 (1933); Board of Councilmen of City of Frankfort v. Pattie, 227 Ky. 343, 12 S.W.2d 1108 (1928); Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119 (1926). The respondent argues that Hansen v. Independent School Dist. No. 1, supra, is distinguishable from the present case in that there the money used to develop the field came from donations from private citizens. This distinction is without merit, however, because once the money and property were donated to the school district, they of course became school district property and hence a lease of that property was as much a lease of public property as a lease of the fairgrounds.

■ As for the expenditures of county funds for insurance premiums for fire insurance on the buildings leased to the Turf Club, it cannot be convincingly argued that this is an expenditure of county funds for private benefit. The county has a reversionary interest in the rather expensive property covered by the insurance and it is

clearly of benefit to the public to insure this interest. The insurance is certainly not of primary benefit to a lessee who has only a short term interest in the property. The water line extension is also an expenditure which is of primary benefit to the public. Although the Turf Club was benefited by the extension of the line to the leased barns, there is testimony in the record that the extension now provides adequate water for protection from fire whereas before there was no such protection. Also, the water line extension to the barn was conceived and planned before the Turf Club leased the premises and was extended at least partly with the idea in mind of later connecting it with a contemplated school water installation which would entitle the county to a refund of part of the cost of installation under a proposal from the utility company. Finally, although the road work on access roads benefited the Turf Club, the work was on roads which provided access to the fairgrounds generally and was primarily of benefit to the public who would use the grounds during the fair.

This court has said on numerous occasions that to constitute a violation of Idaho Const. Art. 8 § 4 and Art. 12 § 4, "it is essential that there be an imposition of *liability,* directly or indirectly, on the political body. Unless the credit or faith of respondent [public body] is obligated there is no constitutional inhibition." Hansen v. Independent School Dist. No. 1, supra. See also Hanson v. City of Idaho Falls, 92 Idaho 512, 446 P.2d 634 (1968). Similarly in Engelking v. Investment Board, 93 Idaho 217, 458 P.2d 213 (1969), dealing with Idaho Const. Art. 8 § 2, which is an analogous provision prohibiting the state from lending its credit, this court stated

"The word 'credit' as used in this provision implies the imposition of some new financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprises." 458 P.2d at 217–218.

The general rule that a municipality can lease its property to a private business when not needed for public purposes is supported by convincing rationale. There is no purpose in requiring property not needed for public use to lie idle when it could be leased, thus relieving the taxpayers of the cost of maintenance and upkeep on the property. This idea was well expressed by the Supreme Court of Pennsylvania in Clarey v. City of Philadelphia, supra, in which the city of Philadelphia leased its convention hall to promoters of professional boxing and wrestling. The lease was so drawn as not to interfere with public use of the building. In upholding the lease the court stated

"Unquestionably this hall, built with public funds upon property dedicated to public purposes, must be held to be devoted to public use. But there can be no sound reason why, when the hall is not required for public purposes, the city may not permit its use by private persons. From its very nature as a building designed to accommodate large groups of people, the hall cannot possibly be in demand for public gatherings for more than a small portion of the time, and necessarily must frequently be idle, yet with little diminution in the cost of maintenance. There can be no objection to the city's receiving a return from the use of the hall by private persons upon occasions when it would otherwise be idle. To say, under the facts of this case, that the city is engaging in private business—that of promoting sporting events or leasing buildings—is absurd. Complainant's contention is, in effect, that the hall must stand unused at all times when it is not in demand for strictly public use. Although he objects only to the use of the hall for professional sporting events, if his objection is sustained for the reasons he gives, or any reasons, the effect is to confine the use of the hall to purely public functions and thereby exclude its use for all private affairs, with the result that the city will be barred from receiving any reve-

nue for its maintenance, and the entire cost thereof will have to be borne by the taxpayers. Such argument must be rejected. It is not sound in law or business practice. It would be folly to require this large and expensive public structure to be kept idle when it is not needed for public use, and when it might be used by private persons for a proper rental, to the mutual advantage of the taxpayers of the city and those permitted to use it." 166 A. at 237–238.

Accordingly, it is our opinion that the lease in the present case does not contravene the constitutional prohibitions.

■ The respondent also argues, however, that the county has spent public monies improving the racetrack facility for the exclusive benefit of the Turf Club. The district court found that since the Turf Club took possession of the premises in 1967, the only expenditures of county funds on the leased property were the expenditures for insurance premiums and for a water line extension into the leased barn area. The court also found that in 1968 the only county expenditures on the property were for insurance premiums and for certain grading and road work on access roads to the premises. These findings of fact are supported by substantial, competent evidence and are binding on this court. Blankenship v. Brookshier, 91 Idaho 317, 420 P.2d 800 (1966); Fairchild v. Mathews, 91 Idaho 1, 415 P.2d 43 (1966).

In the present case the county has incurred no financial or monetary obligation in favor of the Turf Club. All expenditures have redounded primarily to the benefit of the public. Moreover, the lease contains clauses clearly stating that any additional expenses of insurance will be borne by the lessee and that "nothing herein [the lease] shall be interpreted or construed to place any financial burden or liability on the Lessor [county] due to the use thereof by the Lessees."

The respondent strenuously argues that public bids were not let for the contract for construction of the improvements on the leased land and that the work was not done by a public works contractor. Public bids are required for all contracts for public works when it is contemplated that the expenditure of county money will exceed $2,500.00. I.C. § 31–4003. Expenditure is defined in I.C. § 31–4002 as " * * * every manner and means whereby the county disburses county funds or obligates itself to disburse county funds; * * *." The respondent argues that since public bids were not let for the contract in the present case, the contract for construction of the improvements is void and consequently there is no consideration for the lease.

First it should be pointed out that the construction was contracted and paid for by the Turf Club, not by the county, and therefore there was no expenditure of county funds by the county as defined in I.C. § 31–4002. The respondent argues, however, that since the improvements were the consideration for the lease and were in lieu of rent, the effect was the same as if the county had received rent money and expended it for construction of the improvements. He argues that public bids were required in the present case.

■■ We find it unnecessary to decide whether bids were required here because we disagree with respondent's contention that the lack of bids, if they were required, destroys the consideration for the lease. Respondent cites no authority for this proposition. It is true, as respondent contends, that the effect of failure to call for public bids when they are required is to render the contract between the county and the contractor void. See 13 McQuillin, Municipal Corporations, § 37.106, p. 351. Additionally, failure to comply with the statutory requirements for public construction may render tax bills for the improvements unenforceable. See 13 McQuillin, Municipal Corporations, § 37.121, p. 385 (3d ed.), and 14 McQuillin, Municipal Corporations, § 38.178, p. 426 (3d ed.). Also, failure to advertise for bids is a criminal offense in some jurisdictions. See 10 McQuillin, Municipal Corporations, § 29.29,

p. 325 (3d ed.). No authority has been cited, however, and none has been found, holding that where improvements constitute consideration for a lease, the fact that those improvements might not have been constructed in accordance with statutory requirements destroys them as consideration for the lease.

■ The respondent also argues that the present lease is void for lack of consideration in that it is based upon the past consideration under the initial lease which was declared invalid. It is true that under certain circumstances past consideration is insufficient to support a subsequent promise or contract. See Collord v. Cooley, 92 Idaho 789, 451 P.2d 535 (1969). The respondent relies heavily upon Fowler v. Cheirrett, 69 Idaho 224, 205 P.2d 502 (1949), in which this court held that a compromise of a gambling debt was unenforceable. Although the basis of that decision appears to be the court's refusal to enforce an illegal gambling contract, the court stated that

"The rule is that where the original promise is tainted with illegality the taint of illegality cannot be removed by a new promise, based on the alleged consideration of the old one." 69 Idaho at 227, 205 P.2d at 503.

It is this language upon which the respondent relies to support his contention that since the original lease was declared illegal and void by the district court, the taint of illegality could not be removed by the second lease based upon the same consideration which supported the invalid lease.

■ It is clear, however, that there are exceptions to the rule that past consideration will not support a new promise or contract. Corbin in his treatise on contracts states that

"There are degrees of evil and illegality. Some bargains are said to be *malum in se* while others are only *malum prohibitum*. We do not need to accept the theory that there is such a thing as absolute evil to be aware that these terms express relative degrees of harmfulness. A bargain may be so malignantly bad that any party to it deserves no help from the law in getting compensation for value given. But if the bargain is less bad than this, if a lawful performance has been rendered beneficial to the receiver of it, and if the evil and illegal elements and purposes can be abandoned and rendered harmless to society, a promise by the benefited party to pay reasonable compensation for the beneficial performance will be enforceable. It is the executed performance and the moral obligation that will support it." 1A Corbin on Contracts § 236, p. 371.

In the present case the initial lease was held invalid by the district court due to a misinterpretation of the Idaho case law, which we have explained and clarified in regard to the second lease. Although there was no appeal from the judgment holding the initial lease unconstitutional, it was no more illegal for that reason than the second lease which this court has upheld in the present case. Certainly, then, that transaction was not like the illegal gambling contract involved in Fowler v. Cheirrett, supra. Neither was it, as Corbin says, "so malignantly bad that any party to it deserves no help from the law in getting compensation for value given." In the present case the Turf Club completed improvements of substantial value as consideration for the initial lease, which was beneficial to Kootenai County as lessors of the property. Under these circumstances this past consideration is sufficient to support the second lease.

An Idaho case closely in point, and cited by Corbin as an illustration of the use of past consideration to support a new promise, is Sanford v. Kunz, 9 Idaho 29, 71 P. 612 (1903), in which this court upheld a second contract for the repayment of money, the loan of which had been consideration for an earlier usurious contract. In that case it is stated that

"It is well settled that parties can cancel and destroy the old contract, purge the consideration of usury, and make it the basis of a new obligation, and thereby

bind the borrower, in law and equity, to pay the money actually received, and a legal rate of interest therefor." 9 Idaho at 34, 71 P. at 613.

It is our opinion that Fowler v. Cheirrett, supra, is distinguishable from the present case on the grounds that it involved an illegal gambling contract and that under the circumstances of the present case the second lease was adequately supported by the consideration furnished by the Turf Club under the initial lease.

It is clear in the present case that the improvements constructed on the leased property are worth $109,000. The district court so found, and this finding, based upon substantial competent evidence is binding here. Fairchild v. Mathews, 91 Idaho 1, 415 P.2d 43 (1966); Blankenship v. Brookshier, 91 Idaho 317, 420 P.2d 800 (1966). It is clear that value in excess of $100,000 passed to the county in consideration of the lease of this property. Whether the improvements were constructed in accordance with statutory requirements is immaterial here; the value is present and was given in consideration for the lease. Respondent's contention, therefore, that there is no consideration for the lease since public bids were not let is without merit.

The lease between Kootenai County and the Turf Club is not in violation of the Idaho Constitution and it is supported by consideration. The judgment of the district court is therefore reversed. The cause is remanded for further proceedings in conformity with the views herein expressed. Costs to appellant.

DONALDSON and SPEAR, JJ., and SCOGGIN, District Judge, concur.

McQUADE, Justice (dissenting).

I must dissent from the opinion and conclusion of the majority.

I.

Consideration for the lease in the case before us is stated to be the improvements constructed on the Kootenai County fairgrounds. The determination that these improvements are adequate consideration rests on an acceptance of their appraised value of nearly $110,000 as the correct measure of the gain realized from the lease by the county. If these improvements are consideration for this lease, the adequacy of that consideration should be tested not against the $110,000 figure, but against the value of the county's reversionary interest in the buildings at the end of the thirty-eight month lease.

According to the majority's opinion, the area of the "fairgrounds" involved in Turf Club activities is not much, if ever, used for county fair purposes. The county will be unable to rent the property to any horse racing enterprise until 1971. The county will not realize the value of the $110,000 worth of improvements to any meaningful extent for income or for public use until after the lease has expired. Functionally, therefore, the county is leasing the fairgrounds property to the Turf Club for only the value of the reversionary interest in the improvements. The majority opinion recognizes that the county does not enjoy a valuable present interest in the structures when it supports the county's expenditure for insurance by asserting:

"As for the expenditures of county funds for insurance premiums for fire insurance on the buildings leased to the Turf Club, it cannot be convincingly argued that this is an expenditure of county funds for private benefit. The county has a reversionary interest in the rather expensive property covered by the insurance and it is clearly of benefit to the public to insure this interest. The insurance is certainly not of primary benefit to a lessee who has only a short term interest in the property."

Because this reversionary interest is, in fact, the only consideration for the lease, I would reverse and remand this case to the district court for a finding as to the value of that interest and its adequacy as consideration to support this lease.

## II.

I am also of the opinion that the majority's treatment of I.C. § 31–836 is too cursory. Under the brief interpretation of that section given in today's decision, a board of county commissioners may lease literally any quantity of county property to private persons with virtually no public notice or other safeguard as long as the term of the lease is five years or less and the members of the board are unanimous in approving the amount of the rent charged. This situation is not what is required by law.

Art. I, sec. 2 of the Constitution of the State of Idaho states the basic premise upon which our form of government is founded:

> "2. *Political power inherent in the people.*—All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature."

The right to be appraised of what government is doing is a basic right of all Idahoans and all Americans.[1] In service of this right and of the basic principle articulated by art. I, sec. 2 of our Constitution, we have several statutes which require that governing bodies hold open meetings and give ample notice of business to be considered and of extraordinary sessions.[2] The purpose of these statutory controls on procedures under which public bodies conduct the public's business is to insure that government agencies, creatures of the people, may remain subservient to the informed will of the people.[3] Open meetings, at which members of the public who have been given notice of the business there to be transacted participate, contribute to decisions which are more well reasoned and based on better information than do meetings of which the public is ignorant.[4] All of our open meeting statutes serve these same governmental purposes and concern the same general subject, the democratic manner in which local government should be conducted. These statutes should, therefore, be read together as demarcating a great legislative purpose or policy.[5] That policy, briefly stated, is that the people have a right to freely attend meetings of local government bodies so as to be appraised of what occurs there.

In service of that legislative policy, the legislature has determined that meetings of county commissioners be public [6] and that adjourned and special meetings be preceded by ample notice of the business there to be conducted.[7] The public's right to attend a meeting is of small value, however, if the

1. Hennings, The People's Right to Know, 45 A.B.A.J. 667 (1959).

2. *E. g.*, I.C. §§ 31–711, 31–712, 31–713, 59–1024, and 67–5203(1) (2).

3. *See* Sacramento Newspaper Guild v. Sacramento County Board of Sup'rs, 263 Cal.App.2d 41, 69 Cal.Rptr. 480 (1968); Board of Education v. State Board of Education, 79 N.M. 332, 443 P.2d 502, 505 (1968).

4. *See* Note, Open Meeting Statutes: The Press Fights For the "Right to Know," 75 Harv.L.Rev. 1199, 1202 (1962).

5. *See* Glashoff v. Glashoff, 57 Cal.App.2d 108, 134 P.2d 316, 318 (1943); Jordt v. California State Board of Education, 35 Cal.App.2d 591, 96 P.2d 809, 810–811 (1940); Scofield v. Board of Education, 411 Ill. 11, 103 N.E.2d 640, 643 (1952); Kimminau v. Common School Dist. No. 1, 170 Kan. 124, 223 P.2d 689 (1950); Atchison & Eastern Bridge Co. v. Board of County Comm'rs., 150 Kan. 24, 91 P.2d 34, 38 (1939); Clark v. Murray, 141 Kan. 533, 41 P.2d 1042, 1044 (1935); State ex rel. McHale v. Ayers, 111 Mont. 1, 105 P.2d 686, 688 (1940); Pennington v. State, 302 P.2d 170, 174 (Okl.Cr.App.1956); 2 & 3 J. Sutherland, Statutory Construction §§ 4507, 5202, 5401, 5902 (F. Horack 3rd ed. 1943).

6. I.C. § 31–713.

7. I.C. §§ 31–711, 31–712.

public is not given notice of the matters with which the meeting will be concerned.[8] I believe, therefore, that there is implied by the statutory framework concerning meetings of public agencies a requirement that leases not given to the high bidder at public auction be the subject of a public meeting preceded by ample notice.[9] Without such a requirement, these extraordinary transactions will not be subject to democratic check until after a county is bound by a lease with a term of up to sixty months. A requirement that such leases be entered into only after a public meeting, preceded by ample notice and at which commissioners are prepared to explain how the county's interest will be served by the lease, is, therefore, necessary if the legislative purpose of the open meeting laws and the principle of art. I, sec. 2 are to be given effect. Because the majority opinion fails to see the necessity of such requirement, I must dissent.

### III.

I believe that the majority incorrectly states the issue involved in Kootenai County's failure to take bids as prescribed in I. C. § 31–4002 on the improvements which are consideration for the lease. The issue is not whether such a failure so tainted the transaction as to disqualify the improvements to be considered. The issue is whether we will allow counties to avoid the public bid requirement of I.C. § 31–4002 by the device of a lease. Stated as a general proposition, will we allow the county to do indirectly that which the leg-

islature has explicitly stated that they may not do directly?

The economic substance of the transaction in this case is that the county has exchanged a number of buildings for a three year lease. That lease would have had a money value if given in an exchange for cash instead of property. The county has, therefore, bought the new public works constructed by the Turf Club for value equal to the dollar value that the lease would have had in the market place. The county has, in effect, had $110,000 of new public works constructed on public property without complying with the public bid requirements of I.C. § 31–4002. This transaction has either cost or earned the taxpayers of Kootenai County an amount equal to the rental which would have been realized if the property had been leased unimproved with improvements to be built at the lessee's expense or if the county had built the structures and had then leased the improved property to the Turf Club less the value of the Turf Club's improvements. It is now impossible to say whether the cost of the lost rental opportunity is equal to the value of the improvements which the county will receive as a result of this lease. It can be said, however, that the county funds have been denied the safeguard provided by the legislature in I.C. § 31–4002. Because I believe that this evasion of that important safeguard should not be countenanced, I believe that this transaction should be declared void[10] and, therefore, I must dissent from that portion of the majority opinion which treats I.C. § 31–4002.

---

8. *See* Comment, Access to Governmental Information in California, 54 Cal.L.Rev. 1650, 1661 (1966).

9. *See generally* J. Sutherland, *supra* note 5, at § 5402.

10. *See* Edwards v. City of Renton, 67 Wash.2d 598, 409 P.2d 153, 157 (1965).

I need express no opinion at this time concerning what, if any, right the Turf Club should be allowed for its expenditures in constructing the improvements under a void lease; *see id.*, at 157–159.