703 P.2d 714

**UTAH POWER & LIGHT COMPANY, a Utah corporation, Petitioner,**

v.

**Thomas V. CAMPBELL, in his official capacity as Mayor of the City of Idaho Falls, Idaho, Respondent.**

**No. 15944.**

Supreme Court of Idaho.

July 16, 1985.

W.F. Merrill, Pocatello, and Jody Williams, Salt Lake City, for petitioner.

Dale Storer, Idaho Falls, for respondent.

## ON GRANTING OF WRIT OF MANDATE

HUNTLEY, Justice.

On May 2, 1985, Utah Power & Light Company ("UP & L") filed a Petition for Writ of Mandate, requesting this Court command that Thomas V. Campbell, Mayor of the City of Idaho Falls, act in accordance with a February 7, 1985 resolution of the Idaho Falls City Council and execute a ground lease and power sales contract with UP & L. The ground lease and power sales contract both relate to a low-head hydroelectric project on the Snake River known as the Gem State Project ("the Project").

The agreed facts are as follows. On April 7, 1982, UP & L and the City of Idaho Falls entered into a letter of intent wherein the City agreed to construct the hydroelectric project, and to sell a portion of the energy from the Project not required by the City to UP & L. UP & L agreed by that same letter to lease to the City land along the Snake River needed for the Project.

Pursuant to the letter of intent, the City and UP & L negotiated a ground lease and a power sales contract. According to the ground lease, UP & L will lease to Idaho Falls the property needed for the Project through the term of the Federal Energy Regulatory Commission (FERC) license issued to the City for the construction and operation of the Project, and through the term of any renewal or extension of the license. The initial term of the FERC license issued December 12, 1983, is fifty years. In consideration for the use by Idaho Falls of UP & L's land, the City agreed through the power sales contract to sell the company thirty-nine percent (39%) of the electric energy produced annually by the Project, a percentage which the City

may reduce at its option if and when it determines that it is in the City's interest to retain a greater portion of the Project's output. In any case not less than twenty-five percent (25%) of the Project's annual output will be sold to UP & L for the term of the power sales contract, which expires thirty-five years from the date commercial operation of the Project begins.

For the energy it receives, UP & L is bound by the power sales agreement to pay an amount equal to the percentage of the output it takes times the sum of the capital (fixed) costs, the variable costs, and 5% of the sum of the capital and variable costs.

On July 19, 1984 the Idaho Falls City Council adopted ordinance No. 1763, in which it found that it was necessary, desirable and essential to the well-being of the City's inhabitants to undertake acquisition and construction of the Project. The ordinance further recites that because the City did not have sufficient funds to pay the cost of acquisition and construction of the Project, the Project would be financed through the issuance of general obligation bonds pursuant to Chapter 10 of Title 50 of the Idaho Code. The ordinance further provides the City, pursuant to I.C. § 50–1026A, would pledge as an additional source of payment of the bonds, all or any part of the revenues derived or to be derived from rates, fees, tolls or charges imposed for the services, facilities or commodities furnished by the City's power system which was to be improved and extended by the Project.

On September 11, 1984 the City conducted a special bond election for the purpose of submitting the proposition set forth by the ordinance to the electors of the City, which bond issue carried by a majority of the more than two-thirds of those voting in the election.

In November 1984, CH2M Hill, an engineering consulting firm, submitted a study to the city council. The study concluded that the Project was economically feasible for both the City and the region; that the cost of electrical energy to be produced by the Project would be less than the cost of comparable quality electrical energy from other sources likely to be available to the City in the foreseeable future; that the portion of electrical energy proposed to be sold to UP & L would not be required by the City for distribution in its system before the year 2024; and that the long term value to the City of the Project would be greater than that of any other potential electrical energy resource. On that basis, the study concluded, it was desirable and in the public interest for the City to proceed with the acquisition and construction of the Project and to enter into the ground lease and power sales contract with UP & L.

The city council on February 7, 1985, adopted a resolution which authorized and directed the mayor of Idaho Falls, Thomas V. Campbell, to enter into and execute the ground lease and power sales contract. On February 11, 1985, Mayor Campbell wrote a letter to UP & L in which he declined to execute either the ground lease or the power sales contract. He stated that given the proposed issuance of general obligation bonds by the City to pay the cost of acquisition and construction of the Project, the agreements providing for sale of electrical energy to UP & L for a period in excess of the proposed term of the bonds under the conditions contained in the ground lease and power sales contract may constitute an unlawful lending of credit of the City in violation of Art. VIII, Sec. 4 and Art. XII, Sec. 4 of the Idaho State Constitution. Specifically, Mayor Campbell was concerned with the language in *Idaho Falls Consolidated Hospitals v. Bingham County Board of Commissioners*, 102 Idaho 838, 839, 642 P.2d 553, 554 (1982), in which this Court stated, "Art. VIII, Sec. 4 specifically forbids counties [and also cities] from loaning or giving credit 'for any purpose whatever.' Therefore, the fact that the [Medical Indigency] Act in this case serves a public purpose is not enough in itself to uphold its constitutionality." Despite the City Council's finding that the Project would serve a public purpose, Mayor Campbell believed that the ground lease and power sales contract pro-

viding for sale of energy to UP & L for a period in excess of the proposed term of the bonds under conditions contained in the ground lease and power sales contract might represent an extension of credit by Idaho Falls in aid of a private corporation in violation of the Idaho Constitution.

UP & L thereupon filed a petition for writ of mandate, requesting this Court to compel Mayor Campbell to execute the ground lease and power sales contract in conformance with the February 7, 1985 resolution by the City Council. The Court entered an alternative writ of mandate commanding Mayor Campbell to either execute the power sales contract and ground lease with UP & L or show cause by answering the petition why he should not be permanently commanded to comply with the proposed writ. The Mayor filed an answer and both parties requested that the hearing on the writ of mandate be expedited because the City's FERC license requires that construction of the Project commence prior to November 30th, 1985.

Mandamus will lie if the officer against whom the writ is brought has a "clear legal duty" to perform the desired act, and if the act sought to be compelled is ministerial or executive in nature. *Fitzpatrick v. Welch*, 96 Idaho 280, 527 P.2d 313 (1974); *Allen v. Smylie*, 42 Idaho 846, 452 P.2d 343 (1969); I.C. § 7–302. Under I.C. § 50–607, a mayor of a city "shall sign all contracts and conveyances in the name of and on behalf of the City." The mayor of the City of Idaho Falls therefore has a "clear legal duty" to perform the ministerial function of signing all contracts on behalf of the city. Only illegality of the

proposed contract would justify his refusal to execute the ground lease and the power sales agreement after authorization and direction by the City Council to execute them.

In *Idaho Falls Consolidated Hospitals, Inc., supra,* we restated a long-standing construction of the provisions of Art. VIII, Sec. 4 of the Idaho Constitution: namely, that this section imposes an absolute prohibition on any donation or loan of credit by a municipality to a private enterprise.[1]

This Court has commented:

The proceedings and debates of the Idaho Constitutional Convention indicate a consistent theme running through the consideration of the constitutional sections in question. It was feared that private interests would gain advantages at the expense of the taxpayers. This fear appeared to relate particularly to railroads and a few other large businesses who had succeeded in gaining the ability to impose taxes, at least indirectly, upon municipal residents in western states at the time of the drafting of our constitution.

*Boise Redevelopment Agency v. Yick Kong Corp.,* 94 Idaho 876, 883–84, 499 P.2d 575, 583 (1972).

In *Consolidated Hospitals, supra,* we stated, "[I]t is apparent that the framers of the Idaho Constitution were primarily concerned about private interests gaining advantage at the expense of the taxpayer." 102 Idaho at 841, 642 P.2d at 556.

The primary concern of the delegates to the Idaho Constitutional Convention of 1889 in enacting Art. VIII, Sec. 4 and Art.

1. **Idaho Const. Art. 8, Sec. 4. County, etc., not to loan or give its credit.**—No county, city, town, township, board of education, or school district, or other subdivision, shall lend, or pledge the credit or faith thereof directly or indirectly, in any manner, to, or in aid of any individual, association or corporation, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state.

**Idaho Const. Art. 12, Sec. 4. Municipal corporations not to loan credit.**—No county, town,

city, or other municipal corporation, by vote of its citizens or otherwise, shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for, or make donation or loan its credit to, or in aid of, any such company or association: provided, that cities and towns may contract indebtedness for school, water, sanitary and illuminating purposes: provided, that any city or town contracting such indebtedness shall own its just proportion of the property thus created and receive from any income arising therefrom, its proportion to the whole amount so invested.

XII, Sec. 4 was with loans or donations of public credit. One delegate to the convention contrasted two potential arrangements:

It is supposed that we may desire in our town to have water works—in fact, it is a necessity, and let us suppose it will cost $50,000. If a capitalist comes in and says 'I will put $25,000 into the enterprise' and the people of our town will put $25,000 into the enterprise, it seems to me practicable and desirable that the people should be permitted to make the investment of $25,000 in that enterprise. On the other hand we do want to prohibit authority to vote $25,000 to this capitalist and absolutely giving him the money. We want to invest $25,000 in that enterprise and desire to have the income from it. If we furnish water to the town and furnish the money with which to supply the water then let us have our proportion of the money that comes in. And the same rule applies to illuminating the town or anything of this character.

*Proceedings and Debates of the Constitutional Convention of Idaho of 1889*, vol. I, P. 635 (I.E. Hart, ed., 1912)(Comments of delegate Willis Sweet).

■ It is obvious that the framers of the Idaho Constitution had no intention of limiting the power of municipalities to *contract* in furtherance of the public interest, but rather of limiting *loans* or *donations* of public credit. These words clearly limit the scope of the credit clause to cases in which the public credit is under the control of private interests.

■ The transaction between Idaho Falls and UP & L as set forth in the ground lease and power sales contract is neither a loan nor a donation of public credit. It is, rather, an arms-length contract, based on the exchange of adequate consideration. UP & L agrees to lease a parcel of land needed by the City to construct the Project in consideration of the power sales contract. By that contract the City agrees to sell to UP & L up to 39% of the annual energy output of the Project during the term of the contract. The City may reduce that percentage if and when it determines that it is in the City's interest to retain more of the Project's output. Further, not less than 25% of the Project's annual output will be purchased by UP & L, a valuable provision to Idaho Falls because it guarantees a market for at least 25% of the Project's capacity. The sale of power to UP & L insures a source of revenue to assist in paying the bonds used to finance the Project as well as a percentage of the variable costs.

Mayor Campbell also contends that the ground lease and power sales contract do not serve a public purpose. He cites *Village of Moyie Springs, Idaho v. Aurora Manufacturing Co.*, 82 Idaho 337, 353 P.2d 767 (1960), in which this Court held unconstitutional a statute which authorized cities to issue revenue bonds to finance the acquisition of land and construction of facilities that were to be leased to private enterprises. The Court found that the statute and an ordinance enacted under it by the village violated the provisions of Art. VIII, Sec. 4 and Art. XII, Sec. 4, because the primary purpose of these laws was to benefit private enterprise. The Court stated:

It is obvious that one of the prime purposes of having the necessary bonds issued by and in the name of a municipality is to make them more readily salable on the market. Thus, the credit of the municipality is extended in aid of the project, regardless of the limitations placed upon the remedy of the purchaser.

. . . .

It seems clear to us that the revenue bonds are issued by the City in its own name to give them a marketability and value which they would otherwise not possess. . . . the loan of its name by a City to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit. (Citing *State ex rel Beck v. City of York*, [164 Neb. 223] 82 N.W.2d 269 (Neb.1957).

. . . .

. . . [W]e do not agree that an incidental or indirect benefit to the public can trans-

form a private industrial enterprise into a public one, or imbue it with a public purpose. *Id.* at 345–346, 353 P.2d at 772–773.

To the extent that *Moyie Springs* has not been overruled by subsequent constitutional amendment[2] it still stands for the proposition that a violation of the lending of credit provisions of the Idaho Constitution will occur where the putative public purpose to be served by a pledge of municipal credit is but secondary or incidental to a private purpose.

In contrast to *Moyie Springs* is *Hansen v. Kootenai County Bd. of County Commissioners*, 93 Idaho 655, 471 P.2d 42 (1970), in which it was contended that the leasing of a portion of the county fairgrounds to a race track corporation, along with expenditures made by the county for insurance premiums, extension of a water line and road work, constituted a violation of Art. VIII, Sec. 4, and Art. XII, Sec. 4. This Court held that neither provision was violated and distinguished *Moyie Springs* as follows:

> It is our opinion that *Village of Moyie Springs, Idaho v. Aurora Manufacturing Co.,* supra, is distinguishable from the case at bar. The distinction lies in the fact that in that case the city financed with its own funds the acquisition of land which was admittedly not to be used by the village for public purposes, but rather was at the outset intended to be leased to private business. In the present case, on the other hand, the fairgrounds are utilized by the county for the public purpose of conducting the county fair and a portion thereof is leased to a private concern only when not needed for public purposes. It is readily apparent that the Village of Moyie Springs had no use for the land and industrial site it acquired other than to lease it to the Aurora Manufacturing Company, whereas in the present case Kootenai County does have a public use for the fairgrounds and leases them only

when not needed for the public purposes. *Id.* at 660–661, 471 P.2d at 47–48.

Further this Court stated that "[t]here is no purpose in requiring property not needed for public use to lie idle when it could be leased, thus relieving the taxpayers of the cost of maintenance and upkeep on the property." *Id.* at 662, 471 P.2d at 49.

The circumstances of *Hansen, supra,* are more relevant to the instant case. Idaho Falls is acquiring a leasehold and constructing this hydroelectric project for the purpose of supplementing its power supply system. Energy shortages have been forecast for the Pacific Northwest, and Idaho Falls has the obligation to continue to provide electrical energy to its citizens and residents. The City's contract with the Bonneville Power Administration (BPA) obligates BPA to meet the City's future load growths only to the extent BPA can acquire the resources necessary to do so. Therefore, the City must undertake a project of its own to ensure it can supply its present and future needs.

The CH2M Hill engineering report indicated that while the City will eventually need the entire load produced by the Project, the portion of the energy to be sold to UP & L for the term of the power sales contract will not be required during that term. That sales contract, then, does not conflict with the public's use of the property. And though UP & L accrues certain benefits by having available to it some percentage of the supply of the Project, the accrual of incidental benefits to a private enterprise will not invalidate an otherwise constitutional transaction. *Boise Redevelopment Agency v. Yick Kong Corp.,* supra; *Idaho Water Resources Board v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976). The record here contains unrefuted evidence that UP & L will be paying adequate consideration for the energy and capacity it is to receive.

We therefore hold that the ground lease and the power sales contract here do not violate Art. VIII, Sec. 4 or Art. XII, Sec. 4

2. Idaho Const. Art. VIII, Sec. 5.

of the Idaho Constitution. The Writ of Mandate is hereby granted, and the respondent Mayor Campbell is hereby ordered and commanded to execute the contracts on behalf of the City of Idaho Falls.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

Four members of the Court have determined to give Utah Power & Light Company (UP&L) the advisory opinion for which it asks, and I much doubt that anything can be said which will dissuade them. Accordingly, my observations will be short and pointed.

Initially I note that our focus of our attention is on the Snake River and the City of Idaho Falls, through which the Snake River courses. Thus, we have here a latter-day "River City," and we have the "Music Man" (in the form of UP&L) preaching that we have trouble, big trouble, right here in River City. The trouble is that more people are on the way, and more people means a need for more electricity. So, River City—with a total indebtedness as of July 1, 1984 in the amount of just a little over $5–½ million, responding to the alarms and charms of the Music Man—has sought and gained voter approval to sell $48 million of municipal bonds to finance a proposed hydro-electric project. Along with anticipated interest rates, the bonds will require River City to pay back over $184 million. Who gets a substantial benefit from the new source of power? Who, but the Music Man! Who owns the property upon which the new plant will be constructed? Who, but the Music Man! Did the public notice to the taxpayers of River City inform them that they were voting to finance a project to be constructed on the Music Man's property? No, it did not, if I correctly read the public notice found in the record.

While it might be argued that it is not the function of this Court to become overly concerned on behalf of the taxpayers and electrical consumers in River City, it is certainly a proper function to be concerned not only with the constitutional question we are asked to decide, but also with the manner in which that question is presented, and the history of the negotiations of the City of Idaho Falls and UP & L. The only history we have is that which is fed to us in an agreed case, plus what counsel for Mayor Campbell told us at oral argument. None of that history includes the fact that the L.D.S. Church is a dominant stockholder of UP & L, for which reason there also may be a further problem of violation of the constitutionally required separation of church and government. I do not explore this facet of the case beyond mentioning that if UP & L were found to be wholly owned by the L.D.S. Church, this ownership would for certain raise a legitimate constitutional question not at all addressed by the parties. The main thought to be derived from the Church's ownership is a simple one: the sophisticated officialdom of UP & L undoubtedly could be expected to encounter little trouble in persuading the Idaho Falls city officials to build a new hydro-electric facility, to build it on UP & L's real estate, but to let Idaho Falls taxpayers attend to the cost of financing.

The history which we received at oral argument, though not as exhaustive as might be desired, was somewhat enlightening:

JUSTICE BISTLINE: Who negotiated this transaction, who were the negotiating parties?

MR. STORER: Well, I would assume it would be the City and Utah Power & Light. I can represent to the Court that I was involved in the negotiations, if that is the question the Court is asking.

JUSTICE BISTLINE: You were involved?

MR. STORER: Yes.

JUSTICE BISTLINE: On whose behalf?

MR. STORER: I did represent the City of Idaho Falls in that respect.

JUSTICE BISTLINE: You're the city attorney?

MR. STORER: That is correct.

JUSTICE BISTLINE: I understand that. Now, as city attorney do you represent the mayor?

MR. STORER: In my capacity I am not representing the city. I will advise the Court that I discussed that matter with the city council. They were advised that they had the opportunity to participate in this proceeding and if they did so that I would represent them. For whatever reasons, they decline to do so, and for that reason I am now representing the mayor in his capacity—the respondent in his capacity as the mayor. I have had concerns about this transaction throughout the whole negotiation. I think you will find in the record there is a reference at the time the council approved that I recommended, advised the council that there was a concern. That is my firm belief that this does violate the constitution and I think that is reflected in the record.

JUSTICE BISTLINE: Back to the negotiations, you were the city attorney, but were you a negotiating principal in bringing these parties together, as far as they are together?

MR. STORER: I would say that the principal negotiations were done by a consultant of the city with the firm CH$_2$M Hill. I did not become involved in those.

JUSTICE BISTLINE: Now, as city attorney, the mayor has declined—he has declined to sign the necessary papers, as I understand it.

MR. STORER: That is correct.

JUSTICE BISTLINE: Now, can the city council, in your opinion, can they come to court and force the mayor to sign the papers?

MR. STORER: If they so chose, I would agree they could.

JUSTICE BISTLINE: They could try to?

MR. STORER: If they so chose, yes.

JUSTICE BISTLINE: They were not named as a party in this lawsuit?

MR. STORER: No.

JUSTICE BISTLINE: Is there anything else you wanted to tell me to shed light on this rather strange affair?

MR. STORER: Well, again, it's difficult for me to speculate on the reasons why the city council did not decide. Again, they were advised, given the opportunity to appear. If they had desired to appear I assume they could have. And again, I would think that as long as they had not appeared, then I can vigorously represent the interests of the mayor.

JUSTICE BISTLINE: Did city council, or anybody on the city council, actively work with, I think you'd call it, the consultants?

MR. STORER: Yes, I think they would.

JUSTICE BISTLINE: They did?

MR. STORER: They—well, of course, the purpose of the consultants I assume is to advise the council of the considerations with regard to the project. To that extent, the city council was a party to those considerations.

The absence of the city council as a party to this action is conspicuous and perhaps suspect.

### I.

My concern expressed at oral argument, which has not aroused the interest of any other member of the Court, is that UP & L simply has no right to bring this mandamus action against the mayor. Let us take the converse approach.

Supposing the mayor did sign the necessary agreements, and it was J.C. Taylor, President and Chief Executive Officer of UP & L, who declined to execute the agreements on behalf of UP & L. Could the City successfully bring mandamus to compel him to do so? No, not by any principle of law with which I am conversant. UP & L's board of directors perhaps could attempt to mandamus him—a doubtful proposition. In reality, the board would simply remove Mr. Taylor and install a new president.

But, with the City the proposition is different. Statutory law intervenes. The city council is the proper body to determine to enter into a contract, but the mayor is the official designated to sign the contract. As Mr. Storer stated, the contract was negotiated by the city council. The city council is the party, and the only party, who could properly compel the mayor to perform the ministerial act of affixing his official signature as mayor of the City of Idaho Falls. The right in the city council to come into court and mandamus the mayor is peculiar to the city council. It is not an assignable right; nor has assignment of that right been attempted.

One would think that a first year law student would have interposed the plea at bar that UP & L simply had no right to hail the mayor into court. Because Mr. Storer is a capable attorney, it readily may be presumed that he was instructed to *not* raise that plea in bar. From that presumption, it is no great leap to wonder whether the Court has been presented with a feigned, non-justiciable controversy.

## II.

Our recent opinion in *Asson v. City of Burley*, 105 Idaho 432, 670 P.2d 839 (1983) may have precipitated grave and germane concerns as to the worth of the bonds which the city apparently is selling. Whether that be the case is of little moment. A very real problem here is that there is no real controversy between the mayor and UP & L. Until that day when a contract has been entered into, the parties, i.e., the City and UP & L, are simply negotiators, and there is no controversy between them, and none claimed.

Assuming that the mayor genuinely desires that his fears be allayed, and assuming that he not only wants but has encouraged this lawsuit, such still does not mount to the level of a justiciable controversy. The opinion which is sought, and which the Court gives today, is purely advisory. The courts of this state, including the Supreme Court, are not empowered to render purely advisory opinions. That the question is

deemed important is insufficient to confer jurisdiction upon the courts. *Thomas v. Riggs*, 67 Idaho 223, 175 P.2d 404 (1946); *Miller v. State Board of Education*, 56 Idaho 210, 52 P.2d 141 (1935).

In *Wood v. Class A School District No. 25*, 78 Idaho 75, 298 P.2d 383 (1956), Justice Taylor in writing for a unanimous Court, quoted Chief Justice Hughes' language in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937) for the proposition that a "controversy" in the constitutional sense "must be one that is appropriate for judicial determination.... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." 78 Idaho at 78, 298 P.2d at 385. Justice Taylor continued:

It follows that the controversy must be one that is real and substantial, *and if the complaint fails to disclose some legal interest in the plaintiff, no justiciable controversy is presented for defense. Id.*

Recently, after stating that there should be some delineation of the rule that a declaratory judgment action cannot be used to secure an advisory opinion, the Wyoming Supreme Court in *Cranston v. Thompson*, 530 P.2d 726 (1975), adopted two statements from the courts of Kansas and Tennessee:

" * * * *Courts will not render advisory opinions on abstract questions of law about which there is only a disagreement rather than an actual controversy between the parties. * * * *" Wagner v. Mahaffey*, 195 Kan. 586, 408 P.2d 602, 605.

"The Declaratory Judgments Act gives courts no power to determine future rights or controversies in anticipation of events that have not occurred * * *." *Glasgow v. Fox*, 214 Tenn. 656, 383 S.W.2d 9, 13. 530 P.2d at 728–29.

In similar fashion, the Arizona Supreme Court, in *Moore v. Bolin*, 70 Ariz. 354, 355, 220 P.2d 850, 851 (1950) quoted from 16

Am.Jur. Declaratory Judgments § 9 at 282 (1950):

It is well settled that a proceeding for a declaratory judgment must be based upon an actual controversy.... No proceeding lies under the declaratory judgment acts to obtain a judgment which is merely advisory or answers a moot or abstract question.

That court proceeded to quote with approval an annotation at 87 A.L.R. 1205 at 1215 (1933):

"A declaratory relief statute only justifies a declaration of rights upon an existing state of facts, not one upon a state of facts which may or may not arise in the future. Nor will future rights be determined in anticipation of an event that may never happen. * * * "

The writer of the note cites many cases sustaining the general rule as stated, supra, when declaratory relief is sought as to facts involving future events, and in the same note as to facts involving contingent events. 220 P.2d at 852.

Concluding, the Arizona court held:

It is the court's view that the facts pleaded by appellant do not show a present existing controversy which permits the court to adjudicate any present rights. The allegations merely show an intent to do certain things in the future all of which are dependent upon future events and contingencies within control of the appellant. *Id.*

Obviously, Idaho Falls will be vastly aided in its program to sell municipal bonds by a judicial decree spelling out *in advance* the constitutionality of entanglement with UP & L. But it is for attorneys—not the courts—to oblige the City with that advice. The United States Court of Appeals for the District of Columbia, in *Helco Products v. McNutt,* 137 F.2d 681 (D.C.Cir.1943), observed the following about advisory judicial opinions:

Much of the uncertainty of business management could, perhaps, thus be eliminated. What a comfort it would be, if a declaratory judgment could be made

as available as an interoffice memorandum, whenever a board of directors meets to consider a proposed new venture. But that millennium has not yet arrived. 137 F.2d at 684.

### III.

If the constitutional issue were properly before us, my vote would not be with the majority. Primarily I am more persuaded by the argument of counsel representing the mayor. The enterprise upon which the City and UP & L propose to embark together is essentially a joint venture. But the venture requires the City to finance and construct a hydro-electric plant of admitted benefit to the UP & L. Such is beyond dispute. UP & L desires to have more electric power to sell and the City will oblige it—a definite benefit in any language. The fact that UP & L will pay for the power is irrelevant. If UP & L does not pay, or cannot pay, the City may be able to sell the power elsewhere. But no matter what happens, the City is entering this huge venture as the only bearer of risk. The question is not *why* it is being so kind to UP & L, but *whether* it can validly lend its financial aid to secure a supply of power to UP & L which UP & L will sell at the guaranteed mark-up that it gains by reason of being a utility. And, as a matter of great importance, the state of the law is that the hydro-electric plant, a permanent installment on realty leased from UP & L, becomes part and parcel of that realty. The transaction between the City of Idaho Falls and UP & L, as set forth in the Ground Lease and the Power Sales Contract, violates provisions of the Idaho Constitution, because the City is in effect dedicating to a private corporation a portion of the output of a hydro-electric facility to be constructed with the proceeds of its general obligation bonds.

Pursuant to the Power Sales Contract, the City will be absolutely bound to sell to UP & L up to 39 percent of the annual electrical output of the Gem State Project. The City proposes to sell general obligation bonds to finance the Gem State Project.

These bonds are expected to mature prior to the expiration of the Power Sales Contract. In effect, the Power Sales Contract obligates Idaho Falls to construct additional project capability, solely for the benefit of UP & L. The agreements of the City contained in the Ground Lease and the Power Sales Contract amount, at least indirectly, to a pledge of the credit of the City in aid of a private corporation. Such a pledge is flatly prohibited by art. 8, § 4 and art. 12, § 4 of the Idaho Constitution. While revenues of the electric system are intended to be used to retire the bonds, the general obligation bonds nevertheless represent a pledge of the full faith and credit of the City. The sale of electric energy to a private corporation under the circumstances set forth in the Ground Lease and the Power Sales Contract, in conjunction with the issuance of general obligation bonds of the City, results in an impermissible lending of credit of the City for the benefit of a private corporation.

A fundamental limitation on the power of any municipal corporation is that its activities, funded by tax revenues, must primarily serve a public, rather than a private, purpose. 15 McQuillan, Municipal Corporations § 39.19 (3rd ed. 1970); *Idaho Water Resources Board v. Kramer*, 97 Idaho 535, 559, 548 P.2d 35, 59 (1976). This limitation is embodied in both the due process provision of Section 13 of Article 1 of the Idaho Constitution and in the credit clauses of Section 4 of Article 8 and Section 4 of Article 12.

The foregoing proposition is illustrated in *Village of Moyie Springs, Idaho v. Aurora Manufacturing Co.*, 82 Idaho 337, 353 P.2d 767 (1960), which case also controls the resolution of the present controversy. *Moyie Springs* involved an Idaho statute that authorized municipalities to issue bonds to finance the cost of the acquisition of land and facilities which were to be leased to manufacturing, industrial or commercial enterprises. Pursuant to this statute, the Village of Moyie Springs passed an ordinance providing for the issuance of revenue bonds to finance the cost of acquiring land and constructing a facility to be leased

to the Aurora Manufacturing Co. When Aurora questioned the legality of the transaction, the Village brought a declaratory judgment action to adjudicate the rights of the parties and the constitutionality of the statute and the ordinance.

Both the statute and the ordinance were found by this court to violate the provisions of Article 8, Section 4, as an unconstitutional loan of credit by the Village. *Moyie Springs, supra*, 82 Idaho at 345, 353 P.2d at 772. Moreover, the court held that any incidental or indirect public benefit flowing from the venture would not "transform a private industrial enterprise into a public one, or imbue it with a public purpose." *Id.*, 82 Idaho at 346, 353 P.2d at 773. A particular concern of the court was the grievous impact a precedent permitting such selective state favoritism would have upon the free enterprise system:

> The use of the name and credit of the municipality and the tax exemption, to make the bonds salable, are the devices by which the legislature has sought to accomplish the purposes of the act. It is obvious that private enterprise, not so favored, could not compete with industries operating thereunder. If the state-favored industries were successfully managed, private enterprise would of necessity be forced out, and the state, through its municipalities, would increasingly become involved in promoting, sponsoring, regulating and controlling private business, and our free private enterprise economy would be replaced by socialism. *Moyie Springs, supra*, 82 Idaho at 350, 353 P.2d at 775.

Under the holding and reasoning of *Moyie Springs*, the transaction between Idaho Falls and Utah Power & Light contemplated in the sale of energy from the proposed Gem State Project pursuant to the Ground Lease and Power Sales Contract clearly violates the "loan of credit" provisions of the Idaho Constitution.

There is no purpose for the construction of additional project capability other than to benefit Utah Power & Light. Although,

as Petitioner argues, there is a public purpose for that portion of the Gem State Project constructed to meet the future energy needs of Idaho Falls, *the sole beneficiary of up to 39% of the Project's capability during and beyond the period the bonds of the City will be outstanding is Utah Power & Light.* The Power Sales Contract will continue in effect until after the bonds are paid off. Just as there was no primary public purpose for the land to be purchased and facility to be constructed in *Moyie Springs, supra,* the primary beneficiary of the additional generation capacity of the Gem State Project is Utah Power & Light. Any incidental benefits accruing to the public will not transform this private industrial enterprise into a public one.

An examination of the substance, over the form, of the transaction between Idaho Falls and Utah Power & Light contemplated in the Ground Lease and the Power Sales Contract discloses the similarity between this venture and the one held unconstitutional in *Moyie Springs, supra.* The "price" to be paid by Utah Power & Light for the electrical energy it will "purchase" from the City is calculated not according to the prevailing price of electricity but according to a formula based on the finance and operating costs of the Project. In effect, Utah Power & Light will be purchasing a portion of the generating capability of the Gem State Project through its "payment" of the costs of producing its share of the Project's output over the term of the Power Sales Contract. The "purchase" of electricity by Utah Power & Light is, like the "rental" payment to be paid to the Village in *Moyie Springs, supra,* merely a means by which the extended public credit is being repaid by private enterprise. The proposed Ground Lease and Power Sales Contract clearly constitute an invalid loan of municipal credit under Article 8, Section 4 and Article 12, Section 4 of the Idaho Constitution.

In its recent opinion in *Idaho Falls Consolidated Hospitals, Inc. v. Bingham County Board of Commissioners, supra,* this court stated that: "[A]rticle 8, § 4 specifically forbids counties from loaning or giving credit 'for any purpose whatever.' Therefore, the fact that Act in this case serves a public purpose is not enough in itself to uphold its constitutionality." 102 Idaho at 839, 642 P.2d at 554. Because the provisions of Article 8, Section 4 apply equally to cities, any loan of credit by Idaho Falls to Utah Power & Light violates the Constitution, regardless of any public purpose served thereby. Thus, even if the transaction here is found to serve a public purpose, the transaction as set forth in the Ground Lease and the Power Sales Contract is still constitutionally infirm because the credit of the City has been indirectly loaned to Utah Power & Light. Public purpose or not, the Constitution specifically forbids a loan or donation of public credit "for any purpose whatever."

Moreover, the rights of the bondholders for payment of the bonds are enforceable solely against the City, and its tax base, and not against Utah Power & Light. Should Utah Power & Light at some point default on its obligations under the Power Sales Contract, it is the taxpayers of Idaho Falls who will be required to make up the deficiency if other revenues are unavailable. This is an instance of "private interests gaining advantage at the expense of the taxpayer," *Consolidated Hospitals, supra,* 102 Idaho at 841, 642 P.2d at 556, precisely what this court found to be the primary concern of the framers of the Idaho Constitution in enacting Article 8, Section 4. In sum, the transaction between Idaho Falls and Utah Power & Light as set forth in the proposed Ground Lease and the Power Sales Contract violates both the letter and the spirit of the lending of credit prohibitions of the Idaho Constitution.

Petitioner argues to the effect that there is no "loan" or "donation" of public credit, and hence no violation of the constitutional prohibitions, when consideration is received by a public entity in exchange for its extension of credit. This is a proposition which this court has never expressly accepted. To the contrary, the decisions of the court strongly suggest that *any* extension of public credit on behalf of private enterprise

962

violates Article 8, Section 4 and Article 12, Section 4.

The purposes underlying the loan of credit provisions of the Idaho Constitution have been variously stated by this court over the years. A strong theme of many of these statements has been that public money should not be used to subsidize or aid private enterprise. *Atkinson v. Board of Commissioners of Ada County*, 18 Idaho 282, 108 P. 1046 (1910); *School District No. 8 v. Twin Falls County Mutual Fire Insurance Co.*, 30 Idaho 400, 164 P. 1174 (1917). *Idaho Falls Consolidated Hospitals, supra*, 102 Idaho at 839, 642 P.2d at 554. There is a fundamental and justified suspicion of any governmental action which gives favored status to any private enterprise. *Village of Moyie Springs, Idaho v. Aurora Manufacturing Co., supra; Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 499 P.2d 575 (1972). Given these concerns, it matters little whether the public credit is loaned or is given in exchange for consideration. The ultimate result is the same: those private enterprises that are able to obtain an extension of public credit will have the advantage of lower interest rates and the taxpayers will bear the ultimate burden of any default. There is, therefore, no basis for any distinction between an outright loan or donation of public credit and an exchange of consideration for the public credit.

### IV.

The *Village of Moyie* case was a unanimous opinion from a highly respected court. The opinion was authored by Justice C.J. Taylor, and joined by Justice E.T. Knudson, considered by many as Idaho's most outstanding jurist in the last 25 years. The district judge reversed in that case was Clay V. Spear, who saw no constitutional invalidity in the statute and the village ordinance there challenged. This is more than a matter of mere trivia.

Justice Spear was on the Court and participated in *Hansen v. Kootenai County Board of County Commissioners*, 93 Idaho 655, 471 P.2d 42 (1970). He also sat and participated in the forerunner to that case, *Coeur d'Alene Turf Club, Inc. v. Cogswell, District Judge*, 93 Idaho 324, 461 P.2d 107 (1969), and was in fact the necessary third vote for that strange decision and opinion.

I am not convinced by the reasoning of the majority, and believe that some of the authority relied upon is highly questionable. In particular, where we have been spoon-fed an agreed case—a case which never went to any sort of adversarial setting and which could have and should have been first submitted to the district court, as was done in *Sun Valley Company v. City of Sun Valley*, Sup. Ct. No. 15822 (decision pending) I am hardpressed to swallow the philosophy that we should affirm simply because, so it is said, "The record here contains unrefuted evidence that UP & L will be paying adequate consideration for the energy and capacity it is to receive."

### V.

I am also concerned with what will happen at the end of the lease agreement. The agreement between the parties states that the lease is to continue for the duration of the Federal Energy Regulatory Commission license to operate the dam, which is now held by Idaho Falls. What happens if the license is not renewed? My understanding of FERC licensing is that when such licenses are up for renewal they are "up for grabs." There is no guarantee that Idaho Falls will get its license renewed.

Other questions present themselves. Because UP & L is the lessor, and the dam is, no doubt, a fixture, does that mean that upon termination of the lease UP & L will be the happy new owner of a $50,000,000 windfall (in 1985 dollars)? The fact that eminent domain is available to Idaho Falls in condemning the land upon which the dam will be built is of little significance. First, if it is such a viable alternative, why did not the City simply condemn the land now rather than lease it? Second, if the City now cannot afford to condemn the land, what basis is there for believing that it will be able to afford purchasing the

land, complete with a hydro-electric facility, 50 years from now?

These unanswered, disturbing questions hang like the sword of Damocles over Idaho Falls. Such questions highlight the underlying reasons for article 8, § 4 of Idaho's Constitution. While cooperation between private and public entities is proper, a marriage of the two, with all the accompanying entanglements (and subsequent property disputes upon separation), should not be so readily approved by the Idaho Supreme Court—especially where the mayor and the utility have submitted it on a record where we are told that nothing is in controversy between them, other than that the mayor wants some assurance of the constitutionality of the venture. Nothing at all in the record suggested any reason whatever why the city did not acquire ownership of the real property upon which it will build the hydroelectric facility—the cost of which would have been a fractional part of the costly project and the questionable entanglement.