# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51175

| | |
|---|---|
| WILLIAM DOYLE, an individual; LAWRENCE CROWLEY, an individual; THE HARRIS RANCH CID TAXPAYERS' ASSOCATION, an Idaho nonprofit association,<br><br>    Petitioners-Appellants,<br><br>v.<br><br>THE HARRIS RANCH COMMUNITY INFRASTRUCTURE DISTRICT NO. 1; T.J. THOMPSON, in his official capacity as Chairperson and Board member of the Harris Ranch Community Infrastructure District No. 1; HOLLI WOODINGS, in her official capacity as Vice-Chairperson and Board member of the Harris Ranch Community Infrastructure District No. 1; ELAINE CLEGG, in her official capacity as Board member of the Harris Ranch Community Infrastructure District No. 1,<br><br>    Respondents,<br><br>and<br><br>HARRIS FAMILY LIMITED PARTNERSHIP, an Idaho limited partnership,<br><br>    Intervenor-Respondent. | Boise, June 2025 Term<br><br>Opinion Filed: February 12, 2026<br><br>Melanie Gagnepain, Clerk |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Nancy A. Baskin, District Judge.

The decision of the district court is affirmed.

Bailey & Glasser, LLP, Boise, for Appellants William Doyle, Lawrence Crowley and The Harris Ranch CID Taxpayers Association. Nicholas A. Warden argued.

Givens Pursley LLP, Boise, for Respondents The Harris Ranch Community Infrastructure District No. 1; T.J. Thompson, Holli Woodings, and Elaine Clegg. Melodie McQuade argued.

Clark Wardle LLP, and Kirton McConkie, Boise, for Respondent/Intervenor Harris Family Limited Partnership. T. Hethe Clark argued.

_____

MEYER, Justice.

This appeal raises issues of first impression regarding the interpretation and application of the Community Infrastructure District Act (the "CID Act" or "Act"), Idaho Code sections 50-3101 to 50-3121, including what type of projects qualify as "community infrastructure" under the Act. William Doyle, Lawrence Crowley, and the Harris Ranch CID Taxpayers' Association (collectively, the "Residents") filed an action in the district court challenging the decisions of Harris Ranch Community Infrastructure District No. 1 (the "Harris Ranch CID" or the "District") board of directors (the "District Board") to adopt certain resolutions that ultimately resulted in a higher tax burden on Residents. The resolutions included reimbursement to the Harris Ranch Family Limited Partnership and Barber Valley Development, Inc., for the construction of roadways, stormwater facilities, and other infrastructure in the CID.

Residents raised numerous arguments challenging the adoption of these resolutions under the CID Act and under both the Idaho and the United States constitutions. Ultimately, the district court ruled in favor of the District, concluding that certain arguments raised by Residents were either barred under the CID Act's statute of limitations, Idaho Code section 50-3119, or waived under Idaho's preservation doctrine. The district court rejected Resident's remaining arguments on the merits. On appeal, Residents challenge the district court's decision on various grounds. For the reasons discussed below, we affirm the district court's decision.

## I.   THE COMMUNITY INFRASTRUCTURE DISTRICT ACT

A discussion of the CID Act is necessary to frame the import of the facts and litigation history attending this matter. In 2008, the Idaho Legislature passed the CID Act, which allows cities and counties to create special purpose taxing districts called Community Infrastructure Districts ("CIDs") within their boundaries. I.C. §§ 50-3101, -3103, -3105; Act of Apr. 15, 2008, ch. 410, 2008 Idaho Sess. Laws 1139–60. The purpose of the CID Act is to (1) "encourage the funding and construction of regional community infrastructure in advance of actual developmental growth that creates the need for such additional infrastructure;" (2) "provide a means for the

advance payment of development impact fees . . . and the community infrastructure that may be financed thereby;" and (3) "create additional financial tools and financing mechanisms that allow new growth to more expediently pay for itself." I.C. § 50-3101(1)(a)–(c). "'Community infrastructure' means improvements that have a substantial nexus to the district and directly or indirectly benefit the district[,]" and includes roadways, parks, sewers, stormwater facilities, and fire stations, among other public facilities. I.C. § 50-3102(2); *see also* I.C. § 67-8203(24) (defining "public facilities").

To form a CID, two-thirds of the residents in a proposed district or "all of the owners of all the lands located in the proposed district" must sign a petition that is submitted to the governing body or bodies of each county and city in which the proposed district will be located. I.C. §§ 50-3103(1), -3102(9). This petition must include a copy of the proposed "general plan," which describes the community infrastructure to be financed by the district, estimated costs, proposed financing methods, and anticipated tax levies, among other things. I.C. § 50-3103(1). Once formed, these entities are governed by a district board, which consists of "[m]embers of the governing body or bodies at the time of formation[.]" I.C. § 50-3104(2).

Although CIDs are political subdivisions of the State of Idaho, they are "special limited purposes district[s]" wielding only the powers prescribed in the CID Act. I.C. § 50-3105(1). In pertinent part, these powers include the power to "[e]nter into contracts and expend moneys for any community infrastructure purposes and/or district operations," to "finance community infrastructure consistent with the general plan," to "[l]evy property taxes on real property located within the district," and to "incur indebtedness and evidence the same by certificates, notes, bonds or debentures . . . ." I.C. § 50-3105(1)(a), (k), (m). As summarized by the district court: "[i]n simple terms, [the] CID Act allows CIDs to issue and sell bonds to finance the acquisition of 'community infrastructure' already built by a developer and to levy taxes on property owners in a district to pay the debt on the bonds issued." (Quoting I.C. § 50-3105(1).)

This dispute concerns the Harris Ranch CID's authority to issue general obligation bonds and incur indebtedness for certain infrastructure projects. A general obligation bond is a "municipal bond payable from general revenue rather than from a special fund. Such a bond has no collateral to back it other than the issuer's taxing power." *General obligation bond*, Black's Law Dictionary (12th ed. 2024); *see also* I.C. § 50-3108(1). Under the CID Act, the process for obtaining authority to issue general obligation bonds is initiated by the district board. I.C. § 50-

3

3108(1). The CID Act requires the district board to create a resolution that specifies the costs and expenses to be financed with the bond or bonds and provides for an "election" of "qualified electors of the district" to approve the resolution. *See* I.C. § 50-3108(1)–(2). "Qualified electors" consist of the residents and landowners in the district that are qualified to vote under the general laws of the state of Idaho. *See* I.C. § 50-3102(13)(a)–(b). The district board may issue general obligation bonds and incur the indebtedness as specified in the resolution with the consent of two-thirds of the qualified electors during the election. *See* I.C. § 50-3108(3). Thereafter, the district board is entitled, by further resolution, to issue and sell the approved bonds in series or divisions up to the authorized amount without the further vote of the qualified electors. *Id.* Notably, once this authority is obtained, the CID Act does not require that the district board provide notice to the CID's residents, hold a contested hearing, or issue written factual findings and conclusions before it issues a general obligation bond in these instances. *See id.*

The legislature provided a statutory right to challenge a district board's bond-related decisions. Section 50-3119 provides in pertinent part: "[a]ny person in interest who feels aggrieved by the final decision of . . . a district board in the . . . governing of a district, including, with respect to any tax levy, special assessment or bond, may . . . seek judicial review" of the board's decision by filing a "notice of appeal" within sixty days of the board's final decision. I.C. § 50-3119. After this sixty-day period has run, any challenge to a final decision is barred and the "decision shall be considered valid and uncontestable[.]" *Id.* However, apart from the notice and statute of limitations provisions, section 50-3119 does not set forth procedures governing the review or appeal of a district board's bond-related decisions, nor does it provide the scope of review or appeal. *See id.*

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Formation of the Harris Ranch CID and the 2010 General Obligation Bond Election.

The Harris Ranch CID is located in the southeastern corner of the City of Boise ("the City"). The establishment of the District began when the four managing members of the Harris Family Limited Partnership (the "Developer"), the owner of all real property within the District at the time of its inception, filed a petition with the City to create the District pursuant to Idaho Code section 50-3103. The Developer submitted the petition in the wake of the City's approval of a Land Use Development Plan ("the Harris Ranch Specific Plan") for the undeveloped portions of the greater Harris Ranch area. The Harris Ranch Specific Plan was designed to create a pedestrian

4

friendly community and to include a mixture of land uses for the area, such as single-family residential homes, multi-family structures, and commercial spaces.

While the proposed District encompassed the Harris Ranch Specific Plan area, previously developed land in the greater Harris Ranch area was not included in the proposal. Because previously developed areas, including the Harris family's own homes, were not included in the District's boundaries, there were no homes or homeowners in the District at the time of its formation. After holding a public hearing, the City created the District on May 11, 2010. Ten days later, the City expanded the District's boundaries by adding non-contiguous land to the east of the District's original boundaries.

A few months after its formation, in August 2010, the District and the City entered into a Development Agreement with the Developer, which outlined a process for the construction and acquisition of community infrastructure within the Harris Ranch CID. The Development Agreement included provisions related to the issuance of general obligation bonds and special assessment bonds that would reimburse the Developer for community infrastructure built or acquired within the Harris Ranch CID. The Development Agreement also provided that the Harris Ranch CID would pay the Developer for interest accrued between the date of dedication, contribution or expenditure for community infrastructure built or acquired and the time at which the project price or segment price was paid.

In June 2010, the District Board held an election pursuant to Idaho Code section 50-3108 (the "2010 General Obligation Bond Election") to authorize the District Board to incur indebtedness and to issue general obligation bonds in the principal amount of up to $50 million in one or more series, to be repaid over a course of thirty years. The qualified electors approved the resolution to grant this authority to the District Board, which recorded a notice of this authority against all real property located in the District's boundaries. Thereafter, the District Board, by resolution, issued approximately $15.3 million in bonds over nine separate series between 2010 and 2020 to reimburse the Developer for various projects in the Harris Ranch CID. The image below illustrates these projects in pink: *See* Exhibit B.


[*Remainder of page intentionally left blank*]


5



CID Reimbursements
To Date

A—Phase 1 storm water ponds land value
B—Parkcenter Blvd roundabouts construction
C—Warm Springs bypass & right-of-way
D—Wetland improvements and 2011 wetlands
     conservation easement
E—Barber Junction storm water pond
F—Alta Harris Park
G—Deflection Berm
H—Warm Springs Creek realignment
I—Parkcenter right-of-way vacation &
     Parkcenter East construction
J—Warm Springs Creek sediment basin
K—Fire Station 15 land, road, right-of-way
     & Idaho Power service to fire station
L— Village Green/Center Frontage

### B. 2021 Payment Resolution and Bond Resolution

In 2021, the District Board created two resolutions that are the subject of this appeal: Resolution No. HRCID-12-2021 (the "Payments Resolution") and Resolution No. HRCID-13-2021 (the "Bond Resolution") (collectively, "Challenged Resolutions"). The Payments Resolution authorized payments from the District to the Developer for three "projects" the Developer had submitted to the District Board for reimbursement. The first two projects included improvements for Dallas Harris Estates Town Homes Subdivision No. 9 ("Subdivision No. 9 Project") and Dallas Harris Estates Town Homes Subdivision No. 11 ("Subdivision No. 11 Project"), both of which included the construction of sidewalks and roadways within the Harris Ranch CID. *See* Figure 1 (Subdivision No. 9 Project) and Figure 2 (Subdivision No. 11 Project) below.



Figure 1 – Location of GO21-2 Project



Figure 2 – Locations of GO21-3 Project

The Subdivision No. 11 Project also sought reimbursement to the Developer for the construction of stormwater ponds/facilities. The Developer built stormwater facilities on its property. The property was subject to a permanent exclusive easement in favor of the Ada County Highway District ("ACHD"). However, the Developer, rather than ACHD, was responsible for maintaining the stormwater facilities. The third "project" (the "Accrued Interest Project") was a request from the Developer to expend general obligation bond proceeds to pay accrued interest on the Developer's expenditures for twenty-four previously approved projects.

The Bond Resolution authorized the issuance of a general obligation bond (the "2021 General Obligation Bond") in the amount of $5.2 million to finance the Payments Resolution. The Bond Resolution provided that this bond would be issued as part of the series originally authorized by the 2010 General Obligation Bond Election and would be funded by the levy of ad valorem property taxes on homeowners in the District.

In late September 2021, the District Board posted a notice on its website that the resolutions would be considered during a meeting on October 5, 2021. The notice set forth the meeting date, time, location, and proposed projects and resolutions to be presented. The District Board also solicited comments from residents and other members of the public through this website. Thereafter, the District's residents submitted hundreds of comments and twelve letters through the Harris Ranch CID Taxpayers' Association to lodge their objections to the Challenged Resolutions. William Doyle, a named plaintiff in this case, prepared a legal memorandum for the Taxpayers' Association that outlined reasons why the proposed resolutions did not comply with the CID Act; however, he never provided a copy of the memorandum to the District Board.

On October 5, 2021, the District Board held a closed meeting to consider the resolutions and the public comments. Ultimately, the District Board passed the Payment Resolution and Bond Resolution over Residents' objections.

### C. Residents petition the district court to review the District Board's decision to pass the Challenged Resolutions and augment the record.

On December 3, 2021, Residents filed a petition in the district court to review the District Board's approval of the Payments Resolution and Bond Resolution under Idaho Code section 50-3119. Residents also sought to augment the record to include Mr. Doyle's legal memorandum and to complete the record by including records from the formation of the Harris Ranch CID and the 2010 General Obligation Bond Election. The District and the Developer opposed Residents' motion to augment the record and argued that Residents were mounting a collateral attack on the

7

legality of the Harris Ranch CID itself and on the District Board's authority to issue new general obligation bonds following the 2010 General Obligation Bond Election, issues which they claimed were time-barred under the CID Act. Residents maintained that the District and the Developer misunderstood their arguments, and that they sought to augment the record to provide context for the district court. Residents argued that their challenge was only to the Challenged Resolutions but that the district court would not understand their arguments without reviewing the documents related to the Harris Ranch CID's formation and the 2010 General Obligation Bond Election.

The district court denied Residents' motion to complete and to augment the record, determining that it was bound, pursuant to the Idaho Rules of Civil Procedure, to consider only the record that was before the District Board when the District Board decided to adopt the Challenged Resolutions. The district court also clarified that to the extent Residents were challenging the legality of the Harris Ranch CID itself and the 2010 General Obligation Bond Election, the court would not consider those arguments because they were time-barred under the CID Act's statute of limitations. *See* I.C. § 50-3119.

In their opening brief, Residents argued that the Challenged Resolutions did not comply with the CID Act because the CID Act was meant to finance regional infrastructure, not local improvements that only benefited the Harris Ranch CID. Residents largely challenged "[t]he actions of the City through its District, and the Harris family and their developer" which they claimed were "unlawful, unconstitutional and unconscionable," reaching back to the Harris Ranch CID's formation in 2010. Relevant to this appeal, Residents argued that (1) the Harris Ranch CID and (by extension) the District Board were merely the "alter ego" of the City; (2) Subdivision No. 11 Project's reimbursement for stormwater facilities did not satisfy the CID Act because the stormwater facilities were not publicly owned nor were they located on publicly owned land because the land was owned by the Developer; (3) Subdivision No. 9 Project and Subdivision No. 11 Project do not satisfy the CID Act because they are excluded under the fronting exclusion and do not meet the definition of "community infrastructure;" (4) the CID Act could not be used to reimburse the Developer for community infrastructure that was built before the Harris Ranch CID was formed; (5) actions under the CID Act should permit Residents to challenge earlier District Board decisions if they are identical to a final decision that is within the time-frame outlined by Idaho Code section 50-3119; (6) Idaho Code section 50-3119 does not bar the district court from reviewing the decision to form the Harris Ranch CID because its formation was unlawful; (7) the

Challenged Resolutions violate the Idaho Constitution because they were not approved by anyone that would actually pay the resulting ad valorem taxes; (8) the Challenged Resolutions resulted in unequal taxation in violation of the United States or Idaho constitutions; and (9) the Challenged Resolutions violated the Idaho Constitution's prohibition against the lending of credit.

The district court determined that certain arguments were not preserved for appeal because they were not submitted to the District Board, and other arguments were time-barred under the CID Act. The district court declined to address Residents' argument that the CID Act was limited by the Impact Fee Act and that it could only be used to fund "system improvements" because Residents did not present that argument to the District Board. The court determined that Residents' challenges to the formation of the Harris Ranch CID and the 2010 General Obligation Bond Election were time-barred. This included Residents' challenge to the 2021 General Obligation Bond as the district court construed their arguments as a facial challenge to the CID Act and a challenge to the 2010 General Obligation Bond Election.

With respect to Residents' remaining arguments, the district court determined that the "alter ego" argument was unavailing; that the stormwater facilities complied with the requirements of the CID Act; and that the roadways and sidewalks that were part of Subdivision No. 9 Project and Subdivision No. 11 Project likewise qualified as "community infrastructure" under the CID Act. The district court did not address the parties' arguments regarding the definition of the term "fronting" in the CID Act. Finally, the district court determined that neither party was entitled to an award of attorney fees.

Residents subsequently filed a petition for rehearing before the district court, in which they argued that the district court erred when it applied the preservation rule to their claims and that it applied the rule unevenly. Residents reiterated their argument that Subdivision No. 9 Project and Subdivision No. 11 Project did not satisfy the CID Act; they contended that the district court erred when it determined that the stormwater facilities satisfied the CID Act's requirement for "publicly owned" community infrastructure; they maintained that the district court misconstrued several of their arguments to be facial challenges to the CID Act itself; and they argued that the Challenged Resolutions violated the Idaho Constitution's prohibition against the lending of credit. Residents also argued that the Challenged Resolutions resulted in unequal taxation in violation of the United States and Idaho constitutions; and they maintained that the district court erred when it determined

Residents had adequate notice of the Challenged Resolutions. The district court denied Residents' petition for rehearing.

Residents appealed the district court's decision to this Court. Residents maintain that the district court erred when it denied their motion to complete and augment the record; that the district court erred when it applied the preservation rule to their arguments on petition for review; and they raise multiple due process and constitutional challenges to the district court's decision affirming the passage of the Challenged Resolutions, along with questions regarding the interpretation of the CID Act. Residents seek an award of attorney fees on appeal under the private attorney general doctrine.

### III. ISSUES

1. Did the district court err when it denied Residents' motion to complete or augment the record on petition for review?

2. Did the district court err when it applied the preservation rule to Residents' arguments on petition for review?

3. Does the district court's interpretation of Idaho Code section 50-3119 deny due process to Residents and existing and future homeowners in CIDs throughout the state?

4. Does Idaho Code section 50-3119 allow challenges to new payment approvals even if different payments for the same project were approved in the past?

5. Does the Payments Resolution violate the CID Act because it authorizes payments for facilities "fronting individual single-family residential lots"?

6. Does the Payments Resolution violate the CID Act because it authorizes payments for "project improvements" instead of "system improvements"?

7. Does the Payments Resolution violate the CID Act because it authorizes payments for the South Stormwater Facilities even though those facilities are not publicly owned?

8. Is the Harris Ranch CID an alter ego of the City of Boise because the City effectively exercises complete control over the Harris Ranch CID?

9. Does the authorization of the 2021 General Obligation Bond and the levy of taxes violate the Idaho Constitution because the Bond was not authorized by the vote of even one person who would actually pay the resulting taxes?

10. Does the 2021 General Obligation Bond violate the Idaho Constitution because it authorizes the issuance of debt and the imposition of taxes without the required voter approval?

11. Does the 2021 General Obligation Bond violate the Idaho and United States constitutions because the taxes it levies are not uniform across all properties of a similar class?

12. Do the Challenged Resolutions violate the Idaho Constitution because they authorize the lending of credit and gift of public funds by the District to private persons?

13. Are Residents entitled to an award of attorney fees on appeal under the private attorney general doctrine?

## IV.     STANDARDS OF REVIEW

As a preliminary matter, we must determine the standards of review in this case. "This Court has free review over the construction of a statute, which includes . . . the standard of review to be applied if judicial review is available." *Richardson v. Blaine County*, 171 Idaho 806, 809, 526 P.3d 976, 979 (2023) (quoting *Steele v. City of Shelley* (*In re City of Shelley*), 151 Idaho 289, 291, 255 P.3d 1175, 1177 (2011)). The CID Act provides a statutory basis for aggrieved parties to challenge certain decisions of a district board. I.C. § 50-3119. Under the CID Act, "[a]ny person in interest who feels aggrieved by the final decision of a governing body or a district board" may "seek judicial review" of the decision by filing a "notice of appeal" within sixty days after the decision is issued. *Id.* However, as set forth above, apart from the notice and statute of limitations provisions, section 50-3119 does not set forth procedures governing a court's review of a district board's bond-related decisions, nor does it provide the scope of this review. *See id.* Although most petitions for judicial review are governed by the Idaho Administrative Procedure Act ("APA"), which provides the scope of judicial review and available relief in Idaho Code section 67-5279, the CID Act does not reference the APA. In general, this Court will not "apply the [APA to] judicial review situations where the legislature expressed no such intent." *Idaho Hist. Pres. Council, Inc. v. City Council of City of Boise*, 134 Idaho 651, 653–54, 8 P.3d 646, 648–49 (2000). Furthermore, while Idaho Rule of Civil Procedure 84 governs judicial review of administrative and local governing bodies, because this rule does not provide a specific standard of review or the scope of review, it is unclear that Rule 84 governs in this case. *See id.*; I.R.C.P. 84(a)(2), (e)(2).

"We therefore apply the general standard of review for cases in which the district court acts in an appellate capacity. In such cases, this Court reviews the record independently of the district court's decision." *Idaho Hist. Pres. Council, Inc.*, 134 Idaho at 654, 8 P.3d at 649 (citing *Chambers v. Kootenai Cnty. Bd. of Comm'rs*, 125 Idaho 115, 116, 867 P.2d 989, 990 (1994)). "This Court freely reviews the interpretation and application of legislative enactments and court rules." *S Bar Ranch v. Elmore County*, 170 Idaho 282, 312, 510 P.3d 635, 665 (2022) (citation omitted). "Due process issues are generally questions of law" over which this Court exercises free review. *Idaho Historic Pres. Council, Inc.*, 134 Idaho at 654, 8 P.3d at 649.

11

## V. ANALYSIS

### A. The district court erred when it applied the preservation rule to Residents' arguments and declined to complete or augment the record.

The district court declined to consider certain arguments on appeal because Residents did not present those arguments to the District Board. The district court also denied Residents' motion to augment the record with documents submitted in support of these arguments because Residents were unable to show that the documents were presented to the District Board while the District Board was considering whether to adopt the Challenged Resolutions. While the district court acknowledged that "the CID Act does not in itself expressly require [Residents] to raise any arguments below before bringing them before this [c]ourt," it nevertheless declined to consider the legal arguments and authority Residents presented for the first time before the district court. The court explained that, while the District Board meeting "was not a contested hearing at which [Residents] could present public testimony and further legal argument," the Harris Ranch CID website listed information about the District Board meeting and the proposed resolutions and sought input from the public in writing. The court concluded that Residents had an "adequate opportunity to be heard" because they participated when they submitted "hundreds of pages of comments . . . along with the [Harris Ranch CID Taxpayers' Association's] twelve objection letters" in opposition to the Challenged Resolutions. The district court noted that the procedural posture of the case was a petition for judicial review, in which the district court acted in its appellate capacity. As a result, the district court concluded it was limited to the evidence, theories, and arguments that were presented below.

On appeal, Residents argue that the district court's application of the preservation rule in this case constituted a denial of due process because they were not provided the opportunity to present legal arguments and authority to the District Board. They further argue the district court erred when it denied their motion to complete or augment the record to include records from the CID's formation, the District Board's decision in 2010 to authorize the general obligation bond, and the legal memorandum because those documents were necessary to provide context for their arguments in their petition. Residents emphasize the truncated notice period related to District Board meetings, noting that the CID Act does not require that CIDs give advance notice of meetings and, as a result, the District Board may provide as little as twenty-four hours' notice based on Idaho's Open Meetings Laws.

12

Generally, appellate review is limited to the evidence, theories and arguments that were presented below. *Balser v. Kootenai Cnty. Bd. of Comm'rs*, 110 Idaho 37, 40, 714 P.2d 6, 9 (1986). "This is our self-imposed preservation doctrine, and our adherence to it serves many important purposes," including fostering "the full testing of issues by the adversarial process, ensur[ing] that factual records are fully developed," and "aid[ing] the Court in the correct resolution of cases." *Riverton Citizens Grp. v. Bingham Cnty. Comm'rs*, 171 Idaho 898, 904, 527 P.3d 501, 507 (2023) (quoting *Carver v. Hornish*, 171 Idaho 118, 124, 518 P.3d 1175, 1181 (2022)).

However, this Court has noted in the past that this rule "is not absolute" and "the preservation requirement is 'not inflexible' in civil cases under exceptional circumstances." *Carver*, 171 Idaho at 124, 518 P.3d at 1181. "There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon . . . below." *Riverton Citizens Grp.*, 171 Idaho at 904, 527 P.3d at 507 (2023) (internal quotation marks omitted) (quoting *Carver*, 171 Idaho at 124, 518 P.3d at 1181). "Like the United States Supreme Court, we have never announced a general rule with fixed criteria on what constitutes 'exceptional' circumstances sufficient to set aside our preservation doctrine." *Id.* (citation modified). For the reasons set forth below, exceptional circumstances exist here sufficient to set aside our preservation doctrine in this case.

In contrast to other land use decisions or proceedings under the APA, I.C. §§ 67-5201 to 67-5292, or the Local Land Use Planning Act ("LLUPA"), I.C. §§ 67-6501 to 67-6540, the CID Act does not contain the hallmarks of proceedings where the preservation rule is typically applied. Critically, the CID Act does not require a district board to provide a formal administrative proceeding where interested parties may present argument or evidence before issuing a general obligation bond and, therefore, these parties are not afforded the opportunity to preserve an argument or influence the record. Furthermore, even though the decision to issue a general obligation bond is considered a "final" decision under Idaho Code section 50-3119, the Act does not require a district board to articulate in writing the facts found and conclusions reached or its rationale underlying those findings and conclusions. Thus, unlike other land use law that requires a reasoned statement supporting a decision, under the CID Act, an interested party is not afforded the ability to challenge the district board's decision by attacking the board's rationale on review. Therefore, where a district board both declines to accept argument and evidence from interested

parties and does not provide *any* rationale for its decision, the application of the preservation rule would effectually render the statutory right of review under Idaho Code section 50-3119 a meaningless formality rather than a legitimate means of appealing bond-related decisions because the district board would have unilateral authority to preclude issues for review and evidence from the record. However, "[w]e do not presume that the legislature performed an idle act by enacting a meaningless provision[,]" *Brown v. Caldwell Sch. Dist. No. 132*, 127 Idaho 112, 117, 898 P.2d 43, 48 (1995) (citation omitted), and we need not apply our self-imposed preservation doctrine to create such result.

The Developer maintains that Residents' due process argument is "a hypothetical parade of . . . horribles," and urges this Court to affirm the district court's application of the preservation rule in this case. The District and the Developer both note that Residents received more than twenty-four hours' notice in this case and that they were able to object to the Challenged Resolutions in writing. This argument is unavailing.

In contrast to special assessment bonds, which require at least thirty-days' notice and a public hearing in which "any person affected by the proposed special assessment may object in writing or in person," I.C. § 50-3109(2)(d), the CID Act does not contain a notice requirement for regular board meetings or for meetings related to general obligation bonds, I.C. § 50-3108. As a result, the notice period for a hearing to approve the issuance of a general obligation bond is dictated by Idaho's Open Meetings Laws. The version of Idaho's Open Meetings Laws that was in effect in 2021 provided that regular meetings require "[n]o less than a five (5) calendar day meeting notice and a forty-eight (48) hour agenda notice . . . unless otherwise provided by statute." I.C. § 74-204(1) (Supp. 2021). With respect to special meetings and executive sessions, a public agency was required to provide "a twenty-four (24) hour meeting and agenda notice," unless an emergency existed. I.C. § 74-204(2), (3) (Supp. 2021); *see also* I.C. § 74-204(3) (Supp. 2021). The notice requirement is satisfied

> by posting such notices and agendas in a prominent place at the principal office of the public agency or, if no such office exists, at the building where the meeting is to be held. The notice for meetings and agendas shall also be posted electronically if the entity maintains an online presence through a website or a social media platform.

I.C. § 74-204(1) (Supp. 2021).

In this case, it is unclear from the record when notice was originally posted to the Harris Ranch CID website. The record includes a screenshot from the website with notice of the October

5, 2021, District Board meeting that was posted at least as of September 30, 2021, five days in advance of the meeting. The website provided: "On Tuesday, October 5, 2021, at 2pm MDT, the District Board will meet to consider whether to issue a general obligation bond and whether to approve the purchase of projects from Barber Valley Development and the Harris Family Limited Partnership. The notice included information about each of the challenged resolutions, information on previously filed objections from Residents, and information on how to submit written comments in advance of the hearing. The notice solicited comments before September 22, 2021, but extended that deadline to September 28, 2021. Residents received at least five days' notice before the hearing, as opposed to twenty-four-hours' notice. Thus, Residents were not subject to twenty-four hours' notice in this case.

Nevertheless, in our view, because Idaho Code section 50-3108 regarding general obligation bonds does not require a contested hearing and does not require notice of any length of time, it is inequitable to require Residents to abide by our self-imposed preservation doctrine. Although we are cognizant of the district court's concerns that a failure to apply the preservation rule would place the District and the District Board at a disadvantage because they would not be able to address grievances in the moment, when parties are given only a minimum of twenty-four hours' notice, or at most, several days' notice, of a district board meeting and are not permitted to present evidence at the hearing, notions of equity militate against enforcing strict preservation rules. The notice period provides minimal notice and potentially hampers Residents' opportunity to be heard, particularly in a situation such as this, where a contested hearing did not occur. This minimal notice and limited ability of Residents to present their arguments and evidence to the District Board convince us that strict application of the preservation rule is not appropriate under the circumstances. Thus, we conclude that the preservation rule should not be applied in this case.

Residents argue in the alternative that the district court applied the preservation rule unevenly, allowing the District and the Developer to respond with arguments that they failed to raise when they were before the District Board. Because we have already concluded that the district court erred when it applied the preservation rule to Residents' arguments, we need not reach Residents' arguments regarding the uneven application of the preservation rule. However, while the district court erred by declining to consider certain arguments from Residents, including arguments related to the Impact Fee Act, this error does not require reversal because issues of statutory interpretation are reviewed de novo by this Court. Furthermore, as discussed below, any

15

error in the district court's refusal to consider the evidence put forth by Residents is harmless because Residents' attack on the formation of the CID is time barred.

**B. The district court did not err when it determined that it could not review District or District Board decisions from 2010 because they were time barred under the CID Act.**

The district court determined that several of Residents' due process arguments below were collateral attacks on the legality of the formation of the Harris Ranch CID and the 2010 General Obligation Bond Election. We agree. On appeal, Residents maintain that the CID Act should be construed to allow review of prior District or District Board decisions, regardless of the time limitations imposed by the CID Act, when in their view the decisions are "clearly and undeniably unlawful." Residents argue:

> The [d]istrict [c]ourt's interpretation of [the statute of limitations in the CID Act] would necessarily deprive *all* persons in interest, including Residents, of *any* opportunity to be heard regarding the validity, legality and regularity, among other things, of the formation of the [District] and the supposed election to authorize the issuance of the bonds. That would be an unconstitutional denial of due process of law to Residents and all future homeowners in the [District].

Residents' proposed interpretation of the scope of review under the CID Act is impracticable and is unsupported by the plain language of the Act. Idaho Code section 50-3119 provides a strict time limit in which an aggrieved party may bring an appeal:

> Any person in interest who feels aggrieved by the final decision of a governing body or a district board in the formation or governing of a district, including, with respect to any tax levy, special assessment or bond, may, within sixty (60) days after such final decision, seek judicial review by filing a written notice of appeal with the clerk . . . . After said sixty (60) day period has run, no one shall have any cause or right of action to contest the legality, formality or regularity of said decision for any reason whatsoever and, thereafter, said decision shall be considered valid and uncontestable and the validity, legality and regularity of any such decision shall be conclusively presumed. With regard to the foregoing, if the question of validity of any bonds issued pursuant to this chapter is not raised on appeal as aforesaid, the authority to issue the bonds, the legality thereof and of the levies or assessments necessary to pay the same shall be conclusively presumed and no court shall thereafter have authority to inquire into such matters.

I.C. § 50-3119.

Thus, the sixty-day time period under the CID Act acts to prevent current residents of the Harris Ranch CID from contesting the validity of the Harris Ranch CID's formation, but it does not prevent current and future homeowners in the Harris Ranch CID from contesting future District Board decisions. It is worth remembering that Residents *chose* to purchase homes within the Harris

16

Ranch CID, and that they were on notice when they purchased those homes that their property was located within a community infrastructure district. Even if Residents have legitimate concerns about how the Harris Ranch CID was originally formed, they do not have recourse to challenge its formation more than ten years after the fact. *See* I.C. § 50-3119. Likewise, their ability to challenge the 2010 General Obligation Bond Election is limited by the statute of limitations contained within the CID Act. *See id.* The language of section 50-3119 is clear and unambiguous. There is nothing in that section, or other parts of the CID Act, that allows for review of a district board's decisions that were not challenged within the sixty-day window. As a result, to the extent that Residents challenge the formation of the Harris Ranch CID or the 2010 General Obligation Bond Election, we hold those arguments are time-barred.

### C. The district court did not err when it concluded that the roadways at issue in Subdivision No. 9 Project and Subdivision No. 11 Project did not violate the CID Act based on its interpretation of the term "individual single-family residential lots."

Residents argue the Payments Resolution violates the CID Act because it approves funding for roadways "fronting" single-family lots even though Idaho Code section 50-3102(2) expressly excludes "public improvements fronting individual single-family residential lots" from the definition of community infrastructure that can be financed under the Act. Residents contend that "fronting" should be interpreted to mean "facing" or "in front of" single-family residential lots. Residents argue that the term "individual" should be interpreted to mean public improvements fronting one or more "individual single-family residential lots" as opposed to "multiple single-family residences." The District and the Developer counter that the definition of "fronting" should be taken from zoning law, in which "fronting" is defined as "abutting" or "physically touching." The Developer maintains that the "individual" in "individual single-family residential lots" means *one* lot. The District argues the fronting exclusion should be interpreted to exclude public improvements that only benefit "a single lot owner."

The district court explained that it did not need to reach the parties' arguments with respect to the term "fronting" because it concluded that the fronting exclusion only applied to exclude public improvements that benefit *one lot* based on the phrase "individual single-family residential lots." The court explained that Residents' argument—that the fronting exclusion applied to the roadways included in Subdivision No. 9 Project and Subdivision No. 11 Project because they included public improvements that were "in front of" or "facing" single-family residential lots—ignored how the term "individual" modified the phrase "single-family residential lots." The court

17

determined that the phrase "*individual* single-family residential lots" indicated that the CID Act could not be used to fund improvements that only benefited *one* residential lot. The district court further determined that, if Residents' interpretation of the CID Act were adopted, it would largely defeat the purpose of the Act by making it difficult for projects to qualify as "community infrastructure." For the reasons set forth below, we agree with the district court's interpretation of Idaho Code section 50-3102(2).

Generally, statutory interpretation begins with "the literal words of the statute." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011) (citation omitted). "[T]hose words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Id.* (citation omitted). "We have consistently held that where statutory language is unambiguous, legislative history and other extrinsic evidence should not be consulted for the purpose of altering the clearly expressed intent of the legislature." *Id.* (citation omitted). "[A]mbiguity is not established merely because the parties present differing interpretations to the court." *Breckenridge Prop. Fund 2016, LLC v. Wally Enters., Inc.*, 170 Idaho 649, 657, 516 P.3d 73, 81 (2022) (quoting *Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 312, 109 P.3d 161, 166 (2005)). A statute is only ambiguous when its language is "capable of more than one reasonable construction." *Verska*, 151 Idaho at 896, 265 P.3d at 509 (quoting *Porter v. Bd. of Trs., Preston Sch. Dist. No. 201*, 141 Idaho 11, 14, 105 P.3d 671, 674 (2004)).

In our view, the language of the definition of "community infrastructure" is clear and unambiguous. The CID Act defines "community infrastructure" as follows:

> "Community infrastructure" means improvements that have a substantial nexus to the district and directly or indirectly benefit the district. Community infrastructure excludes public improvements fronting individual single-family residential lots. Community infrastructure includes planning, design, engineering, construction, acquisition or installation of such infrastructure, including the costs of applications, impact fees and other fees, permits and approvals related to the construction, acquisition or installation of such infrastructure, and incurring expenses incident to and reasonably necessary to carry out the purposes of this chapter. Community infrastructure includes all public facilities as defined in section 67-8203(24), Idaho Code, and to the extent not already included within the definition in section 67-8203(24), Idaho Code, the following:
>
> > (a) Highways, parkways, expressways, interstates, or other such designations, interchanges, bridges, crossing structures, and related appurtenances;

(b) Public parking facilities, including all areas for vehicular use for travel, ingress, egress and parking;

(c) Trails and areas for pedestrian, equestrian, bicycle or other nonmotor vehicle use for travel, ingress, egress and parking;

(d) Public safety facilities;

(e) Acquiring interests in real property for community infrastructure;

(f) Financing costs related to the construction of items listed in this subsection; and

(g) Impact fees.

I.C. § 50-3102(2)(a)–(g).

The sentence, "[c]ommunity infrastructure excludes public improvements fronting individual single-family residential lots," when read in context is unambiguous. It excludes public improvements that only benefit "individual single-family residential lots." While the definition of "community infrastructure" is written in the plural, the term "single-family residential lots" is modified by the word "individual," strongly suggesting that it is singular. Indeed, the plain and ordinary meaning of the word "individual" is "existing as a distinct entity" or "separate." *See Individual*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/individual (last visited Jan. 30, 2026). "Single-family residential" is a property description that modifies the term "lots." The plain language of the fronting exclusion indicates that public improvements that front *multiple* single-family residential lots are *not* excluded under the Act, but public improvements that front individual single-family residential lots (that is, one such lot) *are* excluded under the Act.

We disagree with Residents' argument that the term "individual" means *one or more* individual single-family residential lots. In fact, reading it this way could effectively read the word "individual" out of the statute. Their interpretation would exclude large swaths of community infrastructure based on its proximity to a residential area. If this Court were to adopt Residents' interpretation of the fronting exclusion, it would make it extremely difficult to fund community infrastructure through the CID Act.

While we acknowledge that the CID Act does not define the term "fronting," we need not reach the parties' arguments regarding the meaning of the word "fronting" because we agree with the district court's interpretation of the fronting exclusion. As the district court noted, the roadways at issue benefit *multiple* individual single-family lots. Based on our interpretation of the fronting

exclusion, the roadways at issue otherwise satisfy the definition of "community infrastructure" based on the plain language of the CID Act. The CID Act requires that the community infrastructure have a "substantial nexus to the district and directly or indirectly benefit the district." I.C. § 50-3102(2). The CID Act's definition of "community infrastructure" expressly includes "[r]oads, streets . . ." as well as "[h]ighways, parkways, expressways, interstates, or other such designations, interchanges, bridges, crossing structures, and related appurtenances." I.C. §§ 67-8203(24)(c), 50-3102(2)(a). As the record shows below, in the Developer's response letters to the Harris Ranch CID Taxpayers' Association, the Developer explained that the roadways at issue are intended to serve "highly trafficked [areas] . . . includ[ing] multi-family development, the future commercial areas of the Village Center, and the future Village Green." The Developer maintained that the roadways include "[s]ignificant trunk infrastructure," and that "[t]hese roadways (and the infrastructure they contain) truly do serve the entire [Harris Ranch] CID." We hold that the roadways included in Subdivision No. 9 Project and Subdivision No. 11 Project satisfy the requirements of the CID Act because they have a substantial nexus to the Harris Ranch CID and they directly serve the residents of the Harris Ranch CID.

**D. The CID Act is not limited by the Impact Fee Act in terms of what community infrastructure may be financed pursuant to the CID Act.**

Residents argue that the CID Act is limited by the Impact Fee Act and only allows for reimbursement of "system improvements" as opposed to "project improvements." They include another variation on this argument, namely that the CID Act only funds "regional" versus "local" community infrastructure. Residents contend that the CID Act must be construed together with the Impact Fee Act because the two statutory schemes are *in pari materia*. Residents' argument is based on the reference to the definition of "public facilities" from the Impact Fee Act included in the CID Act's definition of "community infrastructure," and the CID Act's statement of purpose, which references "regional community infrastructure." I.C. §§ 50-3101, 50-3102(2). On appeal, both the District and the Developer maintain that the Impact Fee Act argument is unpreserved and urge this Court to affirm the district court on that basis. They also counter that Residents rely too much on the CID Act's statement of purpose and note that the CID Act does not contain references to "system improvements" or "project improvements," nor does the Act adopt any of the procedural requirements from the Impact Fee Act. The District argues that this Court should rely on the plain language of the CID Act and not read other elements of the Impact Fee Act into the CID Act.

20

While the district court did not address this argument because it determined the argument was not preserved, we determine that the preservation rule should not apply under the circumstances existing before the District Board, and this Court will address the argument now as it raises questions of statutory interpretation. Generally, this Court will not resort to the canons of construction or other tools of statutory interpretation unless we determine that the language of the statute is ambiguous. *Verska*, 151 Idaho at 893, 265 P.3d at 506. "[I]f we determine the language [of the statute] is unambiguous and the statutory scheme is 'coherent and consistent' after considering the word or phrase itself, the specific context in which its used, and its place in the overall statutory scheme, the 'inquiry must cease.'" *E. Side Highway Dist. v. Kootenai County*, ___ Idaho ___, ___, 572 P.3d 153, 159–60 (2025) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). When the language of the statute is unambiguous, "we have no need for rules of construction, including the *in pari materia* canon, because . . . the language has only one reasonable meaning." *Id.* at ___, 572 P.3d at 160.

We acknowledge that the CID Act *does* reference the Impact Fee Act; however, this alone does not mean that the CID Act *must* be construed as being limited by or as incorporating all terms from the Impact Fee Act, as Residents suggest. The definition of "community infrastructure" includes, as part of a non-exhaustive list, "public facilities" as defined by the Impact Fee Act. I.C. § 50-3102(2)(a)–(g). The Impact Fee Act defines "public facilities" as:

(a) Water supply production, treatment, storage and distribution facilities;

(b) Wastewater collection, treatment and disposal facilities;

(c) *Roads, streets and bridges, including rights-of-way, traffic signals, landscaping and any local components of state or federal highways*;

(d) *Stormwater collection, retention, detention, treatment and disposal facilities*, flood control facilities, and bank and shore protection and enhancement improvements;

(e) Parks, open space and recreation areas, and related capital improvements; and

(f) Public safety facilities, including law enforcement, fire stations and apparatus, emergency medical and rescue, and street lighting facilities.

I.C. § 67-8203(24) (emphasis added). The definition of "community infrastructure" in the CID Act also includes "[h]ighways . . . and related appurtenances" in addition to the stormwater facilities, roads, and streets expressly included by the incorporation of "public facilities" from the Impact Fee Act. *See* I.C. § 50-3102(2)(a). We determine that the language of the CID Act itself, including the definition of "community infrastructure," is unambiguous.

While the definition section incorporates *one specific definition* from the Impact Fee Act, nowhere in the CID Act's operating provisions or elsewhere does the CID Act expressly provide that funding is limited by the Impact Fee Act. *See* I.C. §§ 50-3101 to 50-3121. Likewise, the CID Act does not include the terms "system improvements" or "project improvements," nor does it reference the Local Development Code, both of which are included in the Impact Fee Act. *Compare* I.C. § 50-3102(2), *with* I.C. § 67-8203. It is axiomatic that "[c]ourts must construe statutes 'under the assumption that the [l]egislature knew of all legal precedent and other statutes in existence at the time the statute was passed.'" *City of Idaho Falls v. H-K Contractors, Inc.*, 163 Idaho 579, 584, 416 P.3d 951, 956 (2018) (quoting *Twin Lakes Canal Co. v. Choules*, 151 Idaho 214, 218, 254 P.3d 1210, 1214 (2011)). The Impact Fee Act was first enacted in 1992, and the CID Act was enacted in 2008. *See generally*, Act of Apr. 8, 1992, ch. 282, 1992 Idaho Sess. Laws 860–74 (codified as amended at I.C. §§ 67-8201 to 67-8216); Act of Apr. 15, 2008, ch. 410, 2008 Idaho Sess. Laws 1139–60 (codified as amended at I.C. §§ 50-3101 to 50-3121). Given that the Impact Fee Act is referenced in the CID Act, we can assume the legislature was aware of the Impact Fee Act at the time they enacted the CID Act. As a result, we agree with the District and the Developer that reading other definitions from the Impact Fee Act into the CID Act that were not expressly included in the CID Act is not appropriate.

Further, as we have determined that the definition of "community infrastructure" is unambiguous, we do not need to rely on the *in pari materia* canon of construction to interpret this portion of the statute. We can rely on the plain language of the CID Act to determine whether Subdivision No. 9 Project and Subdivision No. 11 Project satisfy the definition of "community infrastructure." Under the CID Act, the litmus test for whether a project satisfies the definition of "community infrastructure" is whether the improvements "have a substantial nexus to the district and directly or indirectly benefit the district." I.C. § 50-3102(2). Taking into consideration the structures that constitute "public facilities" that are included in the term "community infrastructure," both projects satisfy the definition: Subdivision No. 11 Project includes reimbursement for the construction of roadways, sidewalks, and stormwater facilities, while Subdivision No. 9 Project includes reimbursement for the construction of roadways and sidewalks. Both of these projects have a substantial nexus to the Harris Ranch CID and will benefit the district. Both projects include roads, which are expressly included in the definition of "community infrastructure," as are stormwater facilities. As a result, we hold that the roadways at issue in

22

Subdivision No. 9 Project and Subdivision No. 11 Project satisfy the CID Act's definition of "community infrastructure." We likewise conclude that the CID Act is unambiguous and decline to interpret the CID Act to include the definition of "system improvements" or "project improvements" from the Impact Fee Act. Accordingly, we hold that the CID Act is not limited by the requirements of the Impact Fee Act.

**E. The district court did not err when it determined that the stormwater facilities included in Subdivision No. 11 Project qualified as "community infrastructure" under the CID Act.**

Residents maintain that the stormwater facilities included in Subdivision No. 11 Project do not qualify as "community infrastructure" under the CID Act because the stormwater facilities are not "publicly owned." Residents note that the statement of purpose for the CID Act provides that "[o]nly community infrastructure to be publicly owned by this state or a political subdivision thereof may be financed pursuant to this chapter." I.C. § 50-3101(2). They argue that the stormwater facilities are not located on publicly owned land because the Developer still owns the land, while the ACHD holds a dominant, permanent exclusive easement. The District and the Developer counter that the stormwater facilities qualify as "community infrastructure" because the operative provisions of the CID Act only allow for community infrastructure to be located "on lands, easements or rights-of-way publicly owned by this state or a political subdivision thereof." I.C. § 50-3105(2).

The land at issue is subject to a permanent exclusive easement in favor of ACHD. The Developer granted an easement to ACHD in November 2019. The easement gives ACHD "jurisdiction over the public highways, including sidewalks, and public rights-of-way which adjoin and are adjacent to the Servient Estate," for the purposes of "construction, reconstruction, operation, maintenance and placement of a Highway (as defined in Idaho Code section 40-109) and any other facilities or structures incidental to the preservation or improvement of the Highway including stormwater facilities . . . ." Idaho Code section 40-109 defines "highway" to include, among other things, "necessary culverts, sluices, drains, ditches, waterways, embankments, retaining walls, bridges, tunnels, grade separation structures, roadside improvements, adjacent lands or interests lawfully acquired, pedestrian facilities, and any other structures, works or fixtures incidental to the preservation or improvement of the highways." I.C. § 40-109(5). The CID Act specifically includes highways and "related appurtenances" in the definition of "community infrastructure." I.C. § 50-3102(2)(a).

23

Residents emphasize that the permanent exclusive easement does not amount to a transfer of ownership of the underlying land to ACHD, and as a result, the stormwater facilities are not "publicly owned." However, this argument is unavailing. The fact that the Developer retains an ownership interest in the land as the holder of the servient estate does not preclude the stormwater facilities from qualifying as reimbursable community infrastructure. It is well-established that "[t]he asserted purpose for enacting [a statute] cannot modify its plain meaning." *Verska*, 151 Idaho at 892–93, 265 P.3d at 505–06. While a statute's statement of purpose may be "an appropriate guide to the meaning of the statute's operating provisions," *Gundy v. United States*, 588 U.S. 128, 142 (2019) (citation modified), it "provides no legal authority," and does not "confer legal powers, rights, or duties," *Commonwealth v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023). In other words, "a purpose statement cannot override a statute's operative language." *Biden*, 57 F.4th at 552 (internal quotation marks omitted) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56–57 (2019)). While the statement of purpose for the CID Act provides that "[o]nly community infrastructure to be publicly owned by this state or a political subdivision thereof may be financed pursuant to this chapter," I.C § 50-3101(2), the operative provisions of the CID Act account for community infrastructure located on "easements . . . publicly owned by . . . a political subdivision of [the state of Idaho]," I.C § 50-3105(2). Ergo, even if the underlying land itself is still owned by the Developer, the stormwater facilities are located on a publicly owned easement and are considered reimbursable community infrastructure under the operative provisions of the CID Act. Therefore, we conclude that the district court did not err when it determined that the stormwater facilities satisfied the requirements of the CID Act.

**F. The district court did not err when it determined that the District was not the alter ego of the City of Boise.**

Residents argue that the District is merely the alter ego of the City, and as a result, that the District Board's approval of the Accrued Interest Project, and resulting ad valorem taxes, violated Residents' due process rights and the Idaho Constitution. The District and the Developer counter that Residents' alter ego argument is time-barred because it is targeted at the District Board's ability to issue general obligation bonds and is part of Residents' collateral attack on the legality of the Harris Ranch CID. Alternatively, both the District and the Developer maintain that the District is not the alter ego of the City based on Idaho Code section 50-3104(2)(a) and (8). The district court determined that the District was not an alter ego of the City based on the fact that the District was created pursuant to the CID Act and the CID Act expressly provides that the District

and District Board are separate and apart from the City. For the reasons set forth below, we agree with the district court.

"Courts will pierce the corporate veil and look behind the form of [the] organization to determine the true character of an organization and will disregard corporate form and consider substance rather than form," to determine whether an organization is an alter ego. *O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 325, 303 P.2d 672, 678 (1956) (citations omitted). In more recent cases, we have rejected the argument that an agency is merely the alter ego of a city when the organization is a creature of statute, and the organization lacks the ability to incur indebtedness on the city's behalf. *See Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 880–82, 499 P.2d 575, 579–81 (1972); *Urban Renewal Agency of City of Rexburg v. Hart*, 148 Idaho 299, 301–03, 222 P.3d 467, 469–71 (2009). In *Yick Kong*, we determined that an urban renewal agency was not the alter ego of the City of Boise. 94 Idaho at 882, 499 P.2d at 581. We considered that the urban renewal agency was "an entity of legislative creation," because it was created pursuant to Idaho's Urban Renewal Act, and as a result, "the legislature . . . established [the entity's] powers, duties and authorities." *Id.* at 881, 499 P.2d at 580. Though the city passed a resolution that formed the agency, the Urban Renewal Act's provisions prevented the city from controlling the agency itself. We explained that, "while the legislature may have sought to allow a local voice in the selection of the commissioners . . . , there is no attack upon the integrity or independence of the commissioners," and "that such appointment procedures cause inherent control in the [c]ity." *Id.* at 882, 499 P.2d at 581. We concluded that "the statutory provisions allowing a local voice in the creation of the [agency] do not result in a finding that [the agency] is simply the alter ego of the City of Boise." *Id.* Further, we determined that "[t]he degree of control exercised by the City of Boise does not usurp the powers and duties of the [agency], and the close association between the two entities at most shows two independent public entities closely cooperating for valid public purposes." *Id.*

When asked to revisit whether an urban renewal agency was the alter ego of the City of Rexburg, following amendments to the Urban Renewal Act, we reaffirmed our decision in *Yick Kong*. *See Hart*, 148 Idaho at 302–03, 222 P.3d at 470–71. In *Hart*, we looked to the amended statute and determined that it did not "allow a city to usurp the powers and duties of the . . . agency." *Id.* We focused on a provision in the amended statute addressing the independence of the agency commissioners vis-à-vis the City of Rexburg: "[T]he commissioners 'shall, in all respects

25

when acting as an urban renewal agency, be acting as an arm of state government, *entirely separate and distinct from the municipality*, to achieve, perform and accomplish the public purposes prescribed [by the statute].'" *Id.* at 302, 222 P.3d at 470 (quoting Act of Mar. 30, 1976, ch. 256, 1976 Idaho Sess. Laws 871, 872 (currently codified at I.C. § 50-2006(2)(c))). We concluded that the urban renewal agency did not violate Article VIII, sections 3 and 4 of the Idaho Constitution based on its use of revenue allocation financing *because* it was not an alter ego of the City of Rexburg but was an independent agency.

Residents contend that the City exercises more control over the District than the urban renewal agencies at issue in *Yick Kong* and *Hart*. They compare the District to the gas distribution cooperative at issue in *O'Bryant*, a case where we determined a gas distribution cooperative was merely the alter ego of the City of Idaho Falls. 78 Idaho at 326–27, 303 P.2d at 679. In that case, the City of Idaho Falls could not afford to take on more debt to fund the gas distribution system that it needed, and as a result, a non-profit gas distribution cooperative was created to do what it could not do directly. *Id.* In reaching the determination that the cooperative was really the alter ego of the City of Idaho Falls, we considered several factors, including that the purpose of the cooperative was to eventually transfer all its interests to the City of Idaho Falls, the fact that in effect the cooperative did not have control over its members, and the degree of control the City of Idaho Falls had over the cooperative's board. *Id.* at 323, 303 P.2d at 666–67. We ultimately concluded that "the [c]ooperative is not a true non-profit cooperative association, but is an instrumentality of and controlled by the City of Idaho Falls." *Id.* at 324, 303 P.2d at 677.

In this case, the District and the District Board are more akin to the urban renewal agencies in *Yick Kong* and *Hart* than the gas distribution cooperative at issue in *O'Bryant*. The District was created pursuant to the CID Act, which mandates that, if the district is located entirely within a city, "three (3) members of the city council chosen by the city council shall serve as the district board." I.C. § 50-3104(2)(a). The CID Act also requires that the District and the District Board "shall be separate and apart from any county or city." I.C. § 50-3104(8). Section 50-3104(8) includes that "[t]he members of the district board, when serving in their official capacity as members of the district board, shall act on behalf of the district and not as members of a board of county commissioners or as members of a city council." *Id.* While the City has a role in the composition of the District Board, like an urban renewal agency, it does not have the ability to

usurp the power and duties of the District Board. As a result, we hold that the district court correctly held that neither the District nor the District Board is the alter ego of the City.

### G. Residents' arguments that the 2021 General Obligation Bond violates the Idaho Constitution are time-barred.

Residents argue that the 2021 General Obligation Bond violates the Idaho Constitution because the bond was not authorized by taxpayers, and they argue that the bond imposes ad valorem taxes without the required voter approval. On their face, these arguments appear timely; however, on closer examination, they are really a collateral attack on the formation of the Harris Ranch CID, the District's and District Board's ability to issue general obligation bonds, and are a roundabout way of challenging the 2010 General Obligation Bond Election.

The district court described Residents' argument as the "then-existing voter" argument. In essence, Residents claim they should not be bound by District Board decisions that were made in 2010, when there were no homeowners in the Harris Ranch CID. They contend that they should be able to challenge the 2021 General Obligation Bond, which is the latest bond in a series authorized by the 2010 General Obligation Bond Election.

Section 50-3108(3) of the CID Act outlines the procedures for the issuance of a general obligation bond:

> *If two-thirds (2/3) of the qualified electors at such election assent to the issuing of the bonds and the incurring of the indebtedness thereby created for the purpose aforesaid, the district board shall thereupon be authorized to issue and create such indebtedness* in the manner and for the purposes specified in said resolution, and the bonds shall be issued and sold in the manner provided by the laws of the state of Idaho, and *the district board by further resolution shall be entitled to issue and sell the bonds in series or divisions up to the authorized amount without the further vote of the qualified electors, and to issue and sell such bonds at such times and in such amounts as the district board deems appropriate to carry out a community infrastructure project or projects in phases*; provided however, that before any issuance of the bonds, including issuance in series or divisions and, in addition to such other determinations made by the district board as it may deem reasonable and prudent, the district board shall also determine whether reasonable financial assurance for the payment of the debt service on the bonds through additional collateral, payment guarantee or otherwise shall be required from a developer. The developer shall be consulted and shall be given a reasonable period of time within which to appear, either in person or in writing, and respond to any proposed financial assurance. If, following such developer's response, the district board determines that reasonable financial assurance shall be required, the district board shall specify the type and amount of the financial assurance required in its resolution.

I.C. § 50-3108(3) (emphasis added). The CID Act allows the District Board to continue to issue general obligation bonds up to the authorized amount without a further election. As the district court noted, the 2010 General Obligation Bond Election authorized indebtedness of $50 million to fund the construction and acquisition of community infrastructure. The 2021 General Obligation Bond is another bond in this same series; had the bond amount exceeded the $50 million previously authorized, *then* an election requiring two-thirds approval would have been required.

Residents contend that the Idaho Constitution must be construed to require votes from the actual taxpayers; however, the CID Act only requires votes from "qualified electors." *Id.* There is nothing in the plain language of section 50-3108(3) that mandates that the voters continue to be the same individuals that are responsible for paying the ad valorem taxes. While Residents point to "the gerrymandered boundaries of the [Harris Ranch CID]," and contend that "[t]he drafters of the Idaho Constitution could never have imagined the vote of a single tenant living in a yet-to-be built development could vote to authorize $50 million in bonds and $110 million of taxes which he would never have to pay," they are well past the time allotted to challenge the District's formation or to challenge the results of the 2010 General Obligation Bond Election. *See* I.C. 50-3119.

Residents' argument, related to the 2021 General Obligation Bond imposing ad valorem taxes without the required voter approval, is time-barred based on the plain language of the CID Act because the District Board has the authority to continue to issue general obligation bonds without an election so long as they do not exceed the authorized amount. I.C. § 50-3108(3). In this case, that amount was authorized in 2010. Alternatively, Residents' argument can be interpreted, as it was by the district court, to rest on their contention that the District is the alter ego of the City. In other words, that a city-wide election was required in order for the 2021 General Obligation Bond to issue. Because we have already determined that the District is <u>not</u> the alter ego of the City, this argument also fails.

## H. The 2021 General Obligation Bond does not result in unequal taxation in violation of the Idaho and United States constitutions.

Residents argue that the 2021 General Obligation Bond, issued as part of the Accrued Interest Project, violates Article VII, section 5 of the Idaho Constitution and Amendment XIV, section 1 of the United States Constitution. Residents argue the bond results in unequal ad valorem taxation because Residents are taxed differently than their neighbors whose homes are not part of the Harris Ranch CID but who enjoy many of the same amenities by virtue of their proximity to

the Harris Ranch CID. Residents point out that, on average, they paid $2,400 more in property taxes in the last year than "a single-family home of the same value anywhere else in the [c]ity." The District counters that the 2021 General Obligation Bond does not violate the Idaho Constitution or the United States Constitution because ad valorem taxes are evenly distributed throughout the Harris Ranch CID.

Generally, the party challenging a tax decision bears the burden of overcoming the presumption of constitutionality attached to state taxing decisions. *Justus v. Bd. of Equalization of Kootenai Cnty.*, 101 Idaho 743, 747, 620 P.2d 777, 781 (1980). "Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359 (1973) (footnote omitted). "The test is whether the difference in treatment is an invidious discrimination." *Id.* "Both [Article VII, section 5] of the Idaho Constitution and the federal [E]qual [P]rotection [C]lause proscribe unlawful discrimination by taxing authorities." *Justus*, 101 Idaho at 746, 620 P.2d at 780. "A taxing plan offensive to one also violates the other." *Id.*

Article VII, section 5 of the Idaho Constitution provides:

All taxes shall be uniform upon the same class of subjects within the territorial limits, of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal: provided, that the legislature may allow such exemptions from taxation from time to time as shall seem necessary and just, and all existing exemptions provided by the laws of the territory, shall continue until changed by the legislature of the state: provided further, that duplicate taxation of property for the same purpose during the same year, is hereby prohibited.

Idaho Const. art. VII, § 5.

In this case, Residents concede on appeal that the "taxing authority" at issue is the District; they also concede that the taxes are uniform throughout the Harris Ranch CID. However, Residents maintain that the 2021 General Obligation Bond nevertheless violates both the federal and state constitutions because the District is the alter ego of the City. We determined above that the district court correctly determined that the District is not the alter ego of the City. We hold that Residents have not met their burden in showing that the District Board enacted the 2021 General Obligation Bond with a discriminatory intent, nor have they shown that it results in unequal taxation within the Harris Ranch CID. Thus, we hold that the 2021 General Obligation Bond does not violate the Equal Protection Clause of the United States Constitution, or Article VII, section 5 of the Idaho

29

Constitution because it does not result in unequal taxation by the taxing authority. We also point out that Residents chose to purchase homes in the Harris Ranch CID.

## I. The Challenged Resolutions, including the 2021 General Obligation Bond, do not violate the lending of credit prohibitions in the Idaho Constitution.

Residents contend that the Challenged Resolutions, including the 2021 General Obligation Bond, violate the Idaho Constitution's prohibition against the lending of credit under Article VIII, section 4. Below, Residents also alleged that the Challenged Resolutions violated Article XII, section 4 of the Idaho Constitution, which prohibits counties, towns, or cities from becoming stockholders in a company, corporation, or association; or from raising money for or lending credit to a company, corporation, or association. The District and the Developer maintained that Article XII, section 4 only applied to cities, towns, or municipalities and noted that the Harris Ranch CID is a community infrastructure district, *not* a city, town, or municipality. The district court determined that the Challenged Resolutions do not violate Article VIII, section 4 or Article XII, section 4 of the Idaho Constitution because any benefit to the Developer is incidental to the benefit the public receives from the construction and acquisition of community infrastructure.

Residents raise similar arguments on appeal. While they characterize the Challenged Resolutions as a gift of public funds to the Developer, the bulk of their argument is devoted to how the Challenged Resolutions violate Article VIII, section 4, the prohibition against the lending of credit. Residents maintain that the overall purpose of the Challenged Resolutions is to provide a benefit to a private developer and that the Challenged Resolutions provide only an incidental benefit to the public. The District and the Developer counter that the Challenged Resolutions do not violate the prohibition against the lending of credit, in part because the overall purpose of the Challenged Resolutions is to fund community infrastructure, which primarily benefits the community.

Generally, this Court has held that "a violation of the lending of credit provisions of the Idaho Constitution will occur where the putative public purpose to be served by a pledge of municipal credit is but secondary or incidental to a private purpose." *Utah Power & Light Co. v. Campbell*, 108 Idaho 950, 955, 703 P.2d 714, 719 (1985). A violation does not occur, however, when the accrual of benefits to a private enterprise is incidental to an otherwise constitutional transaction. *Id.* The Idaho Constitution's prohibition against lending of credit provides:

> No county, city, town, township, board of education, or school district, or other subdivision, shall lend, or pledge the credit or faith thereof directly or indirectly, in

30

any manner, to, or in aid of any individual, association or corporation, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any individual, association or corporation in or out of this state.

Idaho Const. art. VIII, § 4. Article XII, section 4 provides:

No county, town, city, or other municipal corporation, by vote of its citizens or otherwise, shall ever become a stockholder in any joint stock company, corporation or association whatever, or raise money for, or make donation or loan its credit to, or in aid of, any such company or association: provided, that cities and towns may contract indebtedness for school, water, sanitary and illuminating purposes: provided, that any city or town contracting such indebtedness shall own its just proportion of the property thus created and receive from any income arising therefrom, its proportion to the whole amount so invested.

Idaho Const. art. XII, § 4.

In *Hansen v. Kootenai County Board of County Commissioners*, this Court determined that the county's decision to lease property to a turf club for use as a racetrack when it was not being used by the public as a fairgrounds did not violate the Idaho Constitution under either Article VIII, section 4 or Article XII, section 4. 93 Idaho 655, 663, 471 P.2d 42, 50 (1970). The plaintiffs in *Hansen*, like Residents, argued that the county's decision violated the Idaho Constitution based on our decision in *Village of Moyie Springs v. Aurora Manufacturing Co.*, 82 Idaho 337, 345–46, 353 P.2d 767, 772–73 (1960). *Id.* at 660, 471 P.2d at 47. In *Moyie Springs*, we determined that bonds were being issued with the primary purpose of benefitting a private enterprise. 82 Idaho at 345–46, 353 P.2d at 772–73. In *Hansen*, we explained that the county's decision to lease property for use as a racetrack was different from the city's decision in *Moyie Springs*:

It is our opinion that [*Moyie Springs*] is distinguishable from the case at bar. The distinction lies in the fact that in that case the city financed with its own funds the acquisition of land which was admittedly not to be used by the village for public purposes, but rather was at the outset intended to be leased to private business. In the present case, on the other hand, the fairgrounds are utilized by the county for the public purpose of conducting the county fair and a portion thereof is leased to a private concern only when not needed for public purposes.

93 Idaho at 660–61, 471 P.2d at 47–48.

While Residents argue that the Challenged Resolutions, including the 2021 General Obligation Bond, are more analogous to the revenue bonds at issue in *Moyie Springs*, the Developer counters that the bond does not violate the prohibition on lending of credit, and Residents' reliance on *Moyie Springs* is misplaced. The District maintains that Residents' prohibition against lending of credit argument fails because the primary purpose of the Challenged

Resolutions is to provide a benefit to the public through the construction of community infrastructure. It also notes that Residents' argument largely rests on their contention that the District is the alter ego of the City.

We agree with the district court that the Challenged Resolutions do not violate Article VIII, section 4 or Article XII, section 4 of the Idaho Constitution. While Residents maintain that the community infrastructure only provides an incidental benefit to the public, in our view the construction and acquisition of roadways and stormwater facilities benefits not only the homeowners within the Harris Ranch CID, but the community at large. As the district court noted, the CID Act's primary purpose is to fund community infrastructure in advance of population growth, and to provide a way for growth to pay for itself. While the Developer may benefit in terms of receiving reimbursement through the Challenged Resolutions, including the 2021 General Obligation Bond, that was not the primary reason the District and the District Board issued the bond. Any benefit to the Developer is purely incidental.

**J. None of the parties are entitled to an award of attorney fees on appeal.**

Residents seek an award of attorney fees on appeal under the private attorney general doctrine. The private attorney general doctrine "contemplate[s] an award of attorney fees to the prevailing party on appeal." *Flynn v. Sun Valley Brewing Co.*, 175 Idaho 612, 568 P.3d 831, 844–45 (2025) (citing *Friends of Farm to Mkt. v. Valley Cnty.*, 137 Idaho 192, 201, 46 P.3d 9, 18 (2002)). "Under this doctrine, attorney fees are justified where: (1) the litigation vindicated an important or strong public policy; (2) private enforcement was necessary in order to vindicate the policy and was pursued at significant burden to the plaintiff; and (3) a significant number of people stand to benefit from the decision." *Friends of Farm to Mkt.*, 137 Idaho at 201, 46 P.3d at 18 (citing *Hellar v. Cenarrusa*, 106 Idaho 571, 577–78, 682 P.2d 524, 530–31 (1984)). Residents are not entitled to an award of attorney fees under the private attorney general doctrine because they are not the prevailing party on appeal.

The Developer does not seek an award of attorney fees on appeal. The District, however, seeks an award of attorney fees on appeal under Idaho Code section 12-117. "Section 12-117 directs the Court to award attorney fees 'in any proceeding involving as adverse parties a state agency or a political subdivision and a person,' if the Court 'finds the nonprevailing party acted without a reasonable basis in fact or law.'" *City of Ririe v. Gilgen*, 170 Idaho 619, 628, 515 P.3d 255, 264 (2022) (quoting I.C. § 12-117). In this case, we decline to award attorney fees on appeal

to the District because Residents' arguments on appeal presented meritorious arguments on issues of first impression regarding the CID Act, which has never been interpreted by an appellate court until now.

## VI. CONCLUSION

For the above-stated reasons, while the district court erred by applying the preservation doctrine and denying Resident's motion to augment or complete the record due to the unique circumstances in this case, this error was harmless because these argument and evidence would not change the outcome of this litigation. Furthermore, because the district court properly rejected Resident's remaining arguments, we affirm the decision of district court dismissing Resident's petition for review. The District and the Developer are entitled to costs on appeal under Idaho Appellate Rule 40(a) as the prevailing parties on appeal.

Chief Justice BEVAN and Justices BRODY, MOELLER, and ZAHN CONCUR.